# United States Court of Appeals
## For the First Circuit

No. 98-1719

JUAN ANTONIO MORALES,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, <u>Circuit Judge</u>,
Bownes, <u>Senior Circuit Judge</u>,
and Stahl, <u>Circuit Judge</u>.

<u>Maureen O'Sullivan</u>, with whom <u>Harvey Kaplan</u>, <u>Ilana Greenstein</u>, <u>Jeremiah Friedman</u> and <u>Kaplan, O'Sullivan & Friedman, LLP</u>, were on brief for petitioner.

<u>Brenda M. O'Malley</u>, Attorney, with whom <u>David W. Ogden</u>, Acting Assistant Attorney General, and <u>Terri J. Scadron</u>, Senior Litigation Counsel, Office of Immigration Litigation, U.S. Department of Justice, Civil Division, were on brief for respondent.

April 5, 2000

**BOWNES, Senior Circuit Judge.** We granted Juan Antonio Morales' petition for rehearing because in our original opinion, issued on October 19, 1999, we misstated in part the burden of proof required to prove a well-founded fear of persecution by applicants if they are deported to their homeland. We stated:

> To prove a well-founded fear of persecution, the "applicant's fear must be both genuine and objectively reasonable." [Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999)] (citing Alvarez-Flores v. INS, 909 F.2d 1, 5 (1st Cir. 1990)). The applicants must prove that "it is more likely than not that they will be persecuted if deported." INS v. Cardoza-Fonseca, 480 U.S. 421, 450, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). "The BIA and many courts of appeals (including this court) narrow the relevant inquiry to whether a reasonable person in the asylum applicant's circumstances would fear persecution on account of a statutorily protected ground." Aguilar-Solis, 168 F.3d at 572.

Morales v. INS, 1999 WL 897658, at *6 (1st. Cir., Oct. 19, 1999) (withdrawn) (emphasis added).

We agree with the petitioner that in INS v. Cardoza-Fonseca, the Court held the contrary of what we said it did. It stated:

> Whether or not a "refugee" is eventually granted asylum is a matter which Congress has left for the Attorney General to decide. But it is clear that Congress did not intend to restrict eligibility for that relief to

-3-

> those who could prove that it is more likely
> than not that they will be persecuted if
> deported.

480 U.S. at 450 (emphasis added).  Two issues were addressed in the rehearing briefs: the burden of proof required for showing a well-founded fear of persecution; and the application of the doctrine of imputed political opinion.

At oral argument, petitioner argued the same issues he had raised and argued the first time around and the government replied in kind.  We think it advisable, therefore, to revisit all of the issues raised originally because they bear on the two issues before us.

## I.  BACKGROUND

Before we address the issues, we recount the background facts.  Morales, a native and citizen of Guatemala, entered the United States without inspection on May 10, 1992.  On April 11, 1995, the Immigration and Naturalization Service ("INS") issued an Order to Show Cause why Morales should not be deported.  Subsequently, Morales filed a petition for political asylum.  The Immigration Judge ("IJ") considered Morales' petition for political asylum to be a request for withholding of deportation as well.

In his affidavit in support of his application for political asylum, Morales alleged that he was persecuted in

-4-

Guatemala because of his association with a labor union. Morales worked as a machine operator for Industria Centro Americana Debedrio, S.A. ("Cavisa"), in Guatemala City from 1980 until 1990. In 1990, the ownership of the company changed and the representatives of the union demanded better working conditions and higher pay. When the demands were refused, the union leaders declared a strike and the gates to the factory were locked. Morales was detained in the factory with the other 700 workers until "[t]he gates were finally unlocked, and [he] managed to escape." The record reveals that although the strike lasted for at least several weeks, Morales was able to flee the factory after he was there one week.

Although Morales never returned to the company, he claimed that for the next two years, he "encountered problems because of [his] involvement in the labor dispute." As already noted, Morales left Guatemala and arrived in the United States on May 10, 1992. In his affidavit, Morales claimed that if he were forced to return to Guatemala, he would be "persecuted because of the mistaken belief by Guatemalan military and government authorities that [he] supported the labor unrest at [his] former job."

After a hearing, the Immigration Judge determined that Morales was "only barely associated with the union" and his

"minimal involvement in the union" would not impute to him a political opinion that would be the basis for persecution. The IJ also determined that "[i]f indeed the security forces of Guatemala wished to persecute or punish this gentleman, they could have easily done so." The IJ denied Morales' application for political asylum and withholding of deportation, but granted voluntary departure in lieu of deportation.

Morales appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), arguing that the IJ erred by concluding that Morales did not establish eligibility for asylum and withholding of deportation. Morales also argued that the IJ denied him a fair trial, violating his right to due process. The BIA dismissed the appeal, finding that Morales had not met his burden of proving his eligibility for asylum and withholding of deportation and that his hearing met due process standards. This appeal followed.

## II. DENIAL OF DUE PROCESS

Morales claims that he was denied his Fifth Amendment right to a full and fair hearing[1] and his statutory right to a reasonable opportunity to defend himself in his deportation

---

[1]Reno v. Flores, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

hearing[2] because the IJ precluded him from testifying and ignored substantial documentary and testimonial evidence which corroborates his claims for asylum.

Morales argues that the IJ violated his Fifth Amendment rights when he "cut short" Morales' direct examination, cross-examination and redirect examination, and precluded him from addressing fundamental elements of his claim for asylum.  We review the question of whether an administrative law judge violated a party's due process rights de novo.  See Aguilar-Solis, 168 F.3d at 568.

After careful evaluation of the record, we are convinced that Morales received a fair hearing and was not deprived of his due process rights.  The record reflects that, although the IJ may have been somewhat impatient, he did not deny Morales a full and fair hearing on his asylum application. See Iliev v. INS, 127 F.3d 638, 643 (7th Cir. 1997) ("Although the Immigration Judge may have been 'brusque,' and perhaps could have achieved his objective in a more courteous manner, it is difficult to say on the cold record that his approach warrants criticism; certainly, he did not deny a fair trial.") (footnote omitted).

---

[2]8 U.S.C. § 1229a(b)(4)(B) (Supp. II 1996).

A party is entitled to a fair trial and nothing more. See Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997) (finding that the petitioner "received a fair trial, albeit not a perfect or an unblemished one"). The Supreme Court has held that "expressions of impatience, dissatisfaction, annoyance, and even anger . . . are within the bounds of what imperfect men and women . . . sometimes display. A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune." Liteky v. United States, 510 U.S. 540, 555-56 (1994).

Morales argues that "he was not permitted a reasonable opportunity to present evidence on his own behalf. . . . [and h]is hearing, therefore, did not constitute a 'full and fair' hearing within the meaning of the Fifth Amendment." (Pet'r's Br. at 14.) Morales contends that the IJ "cut short" his direct examination and directed that cross-examination begin. The record contradicts this contention.

The record reveals that the IJ allowed Morales to testify on direct examination without interruption. Morales testified to the date and place of his birth, as well as his entrance into the United States. He testified about his work in Guatemala and his association with the union. Morales further

-8-

testified that he left Guatemala because he was afraid of being harmed as a result of his association with the union. Morales testified to the relationship between the union and the Guatemalan military and government.

After this testimony concluded, the IJ said, "I think I understand the fact pattern. Why are you afraid to go back now?" Morales then testified that he feared, because of his participation in the union, that the government authorities would harm him. When Morales finished testifying about why he was afraid to return to Guatemala, the IJ asked for cross-examination. There was no objection by Morales' attorney which would have indicated to the IJ that Morales was not through with his testimony or that he was being "cut short." Morales' attorney did not indicate that there was additional testimony to corroborate his client's claim for asylum. At oral argument, the argument was made by Morales that his attorney intended to develop the facts more fully on redirect examination. This was a strategic choice that cannot now be erased. Moreover, the record discloses that Morales' attorney was given an opportunity <u>after cross examination</u> to augment the evidence, which was done by offers of proof.

Morales claims that "[h]e was not . . . provided an opportunity to testify as to his union membership, the

persecution of his fellow union members, or the relationship between the factory owners and the Guatemalan government. Nor was he able to provide a full, detailed description of the many instances of harassment and violence which form the basis for his asylum claim." (Pet'r's Br. at 17.) The record discloses, however, that Morales did testify to all of those things. Morales testified about his association with the union and about the persecution of the members of the labor union. He also testified about the relationship between the factory owners and the Guatemalan government and he detailed instances when he claimed he was personally harassed. Morales' attorney also made offers of proof as to those same circumstances which were accepted as true by the IJ.

The only instance of the IJ "cutting short" Morales' testimony was during cross-examination. The IJ cut off questioning of Morales by the INS attorney, saying "[y]ou're done. . . . I've heard enough." But the IJ then gave Morales' attorney an opportunity to present additional evidence, turning to him asking "What did you want to bring out now? We have to do it quickly." Thereupon, Morales' attorney dictated those facts which he wanted to present to the IJ, who accepted this offer of proof as true. Morales' attorney made no objection to this procedure.

Morales further contends that his due process rights were violated when the IJ ignored substantial documentary and testimonial evidence which supported his claim for asylum. Morales argues that the IJ "was remarkably unresponsive. . . . [and d]espite repeated attempts [his attorney] was unable to direct the Judge's attention to the first page of the supporting documentation." (Pet'r's Br. at 21.) Our review of the record, however, shows that there is no indication that the IJ ignored substantial evidence. In fact, after Morales' attorney directed the IJ's attention to the documentation, the IJ responded, "I'm looking at [it] - it's Amnesty International 1996."

This court has held that each piece of evidence need not be discussed in a decision. "Where, as here, the Board has given reasoned consideration to the petition, and made adequate findings, we will not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented." Martinez v. INS, 970 F.2d 973, 976 (1st Cir. 1992). Morales' claim that the IJ and the BIA violated his due process rights when they ignored substantial documentary and testimonial evidence is without foundation.

We find that the IJ provided Morales with a full and fair hearing on his asylum petition. As we held in Aguilar-Solis, "the IJ's neutrality cannot seriously be doubted. Even

if viewed through a jaundiced eye, the transcript reflects nothing more sinister than a modicum of impatience.  This is not the stuff from which a due process violation can be fashioned." Aguilar-Solis, 168 F.3d at 569.  Though the IJ may have been somewhat impatient during the hearing, there is no evidence of bias or unfairness.  The record reflects that Morales had the opportunity, on direct and cross examination and by his attorney's offers of proof, to present fully his claim for asylum.  Morales argues that it is insufficient "to satisfy due process that Mr. Morales' attorney was permitted to introduce portions of the excluded testimony into the administrative record as offers of proof."  (Pet'r's Br. at 19 n.6) (citing Vissian v. INS, 548 F.2d 325, 330 (10th Cir. 1977)).  That argument fails because Vissian is fundamentally distinct from the instant case.  In Vissian, the "isolated offer of proof . . . was summarily rejected in the immigration judge's decision." Vissian, 548 F.2d at 330 (emphasis added).  Here, the offers of proof made by Morales' attorney were explicitly accepted as true.

## III.  POLITICAL ASYLUM

Morales claims that the BIA erred when it held that Morales was not eligible for political asylum or withholding of deportation.  To be eligible for political asylum, an alien must

demonstrate that he is a refugee.  See 8 U.S.C. § 1158(b)(1)

(Supp. II 1996); 8 C.F.R. § 208.13 (a) (1997).  A "refugee" is

defined as:

> any person who is outside any country of such person's nationality or . . . is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A) (Supp. II 1996).

"[T]o obtain judicial reversal of the BIA's

determination, [Morales] must show that the evidence he

presented was so compelling that no reasonable factfinder could

fail to find the requisite fear of persecution." INS v. Elias-

Zacarias, 502 U.S. 478, 483-84 (1992).

> We review the Board's findings directly, mindful that in contemplation of law [the findings of the IJ] have become the [Board's].  We review a Board decision to deny an application for asylum deferentially.  We will affirm if the Board's conclusion is supported by reasonable, substantial, and probative evidence on the record considered as a whole.

Vasquez v. INS, 177 F.3d 62, 64 (1st Cir. 1999) (alterations in

original) (citation and internal quotation marks omitted).

"[I]f the petitioner is to prevail, the administrative record,

viewed in its entirety, must compel the conclusion that he is

asylum-eligible." Aguilar-Solis, 168 F.3d at 569.

-13-

Asylum eligibility may be established by demonstrating either past persecution or a well-founded fear of future persecution. See Aguilar-Solis, 168 F.3d at 572. The BIA held that Morales "was not a victim of persecution prior to his departure from Guatemala years ago. . . . [and] did not adequately demonstrate before the Immigration Judge that he presently has a well-founded fear of persecution in his homeland." To reverse the BIA, this court must find that the evidence presented by Morales was so compelling that "no reasonable factfinder could fail to find the requisite fear of persecution." Elias-Zacarias, 502 U.S. at 484. Morales failed to meet this burden.

**Past Persecution**

In his application for political asylum, Morales claimed that he was persecuted in Guatemala because of his association with the Cavisa labor union. Morales claimed that he "was often followed by soldiers as [he] commuted in [his] car . . . and [he] received several anonymous notes and telephone calls that accused [him] of being a subversive and threatened harm to [his] family." He also claimed that "a car with blackened windows pulled up next to [him] and stopped. . . . and a uniformed man pointed a rifle at [him]."

At the hearing before the IJ, Morales testified that "some unknown people followed [him]", and he "[thought] those people were in the army because of the type or class of weapons they carried, and they attempted [to enter the place where he parked his car.]" Morales testified that he was never arrested or imprisoned, but claimed that he was shot at by unknown men. He claims that this evidence requires a determination that "he suffered past persecution at the hands of Guatemalan governmental agents on account of his union membership and imputed political opinion." (Pet'r's Br. at 55.) We do not agree. After review of the record, we find that the evidence does not compel a finding that Morales was persecuted on account of his association with the labor union.

There is some confusion in the record as to whether Morales was a union member or was merely associated with the union simply because of his employment at the factory. Nonetheless, it is evident that Morales was not an active participant in union activities. Though union meetings were held twice a week, Morales only attended two meetings per year. Morales held no official position in the union and was not a leader or organizer of the union strike at the factory.

After Morales fled the factory during the strike, he left his job, and therefore his association with the union, and

-15-

moved to a farm outside Guatemala City, leaving his wife and children behind. For the next two years, Morales worked on a farm which was located over an hour away from the factory. Morales testified that while he was working on the farm, he "was followed by some men that allegedly . . . belonged to the army because of the types of weapons they carried." At that time, Morales was no longer working at the factory and was no longer associated with the labor union.

The documentary evidence submitted by Morales, consisted of human rights reports, U.S. State Department documents and other authoritative reports. It does not compel the finding that Morales suffered past persecution on the basis of political opinion. Arguably, these documents undermine Morales' claim for asylum. They indicate that the unionists harmed were primarily leaders or active members of the union. Morales was neither a leader of the union nor an active participant in its activities. The IJ doubted whether the events alleged by Morales actually occurred "because of the implausibility of the contentions. . . . If indeed the security forces of Guatemala wished to persecute or punish this gentleman, they could have easily done so."

Morales claimed that he was persecuted in Guatemala because of his association with the union. Morales claims that

-16-

"it is only logical to infer that [his] persecution stemmed from his involvement with Cavisa's union." (Pet'r's Br. at 58.) While the IJ might have drawn that inference, he "chose to draw a contrary, equally plausible inference. Such choices are a factfinder's prerogative. Where, as here the constellation of facts and circumstances alleged by an asylum applicant, together with the other record evidence, supports two or more competing inferences, the IJ's choice among those inferences cannot be deemed erroneous." Aguilar-Solis, 168 F.3d at 571. Although Morales' association with the union *may* have played a part in the incidents alleged, the record does not *compel* that finding. The contrary, equally plausible inference is that Morales was not persecuted in Guatemala and his reason for stating that he was persecuted is his desire to remain in the United States.

The IJ ultimately determined that Morales failed to demonstrate that he was targeted because of his "minimal involvement" with the union and denied his application for asylum. Substantial evidence in the record supports this finding and we must decline Morales' invitation to overturn that decision.

**Well-Founded Fear of Persecution**

To prove a well-founded fear of persecution, the "applicant's fear must be both genuine and objectively

-17-

reasonable." Aguilar-Solis, 168 F.3d at 572 (citing Alvarez-Flores, 909 F.2d at 5). But the applicants need not prove "that it is more likely than not that they will be persecuted if deported." Cardoza-Fonseca, 480 U.S. at 450. "The BIA and many courts of appeals (including this court) narrow the relevant inquiry to whether a reasonable person in the asylum applicant's circumstances would fear persecution on account of a statutorily protected ground." Aguilar-Solis, 168 F.3d at 572. Applying this standard, Morales fails to demonstrate a well-founded fear of persecution. The BIA determined that Morales "did not adequately demonstrate before the Immigration Judge that he presently has a well-founded fear of persecution in his homeland." Substantial evidence in the record supports that conclusion.

Morales explained that he is afraid to return to Guatemala because he believes that the government and military authorities will harm him because he was a member of the union.

The documentary evidence indicates, however, that although some union members may have been persecuted, those harmed were primarily union leaders or active members. There is no evidence which corroborates Morales' allegations that he was personally followed, harassed or threatened, or would be in the future.

The BIA determined that Morales had not suffered past persecution by reason of his association with the labor union. it also found that Morales did not have a reasonable well-founded fear of future persecution if he were returned to Guatemala. In order to reverse we must find that the evidence presented was so compelling that no reasonable fact-finder could fail to find that Morales was persecuted on the basis of political opinion or had a well-founded fear of such persecution. See Elias-Zacarias, 502 U.S. at 483-84; Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992). Morales has failed to meet this burden. Morales has failed to establish that Guatemalan authorities were aware that he had once belonged to the Cavisa union member or that he was even marginally involved in the union's 1990 strike. Even if Guatemalan authorities knew Morales had been a Cavisa union member who was involved in the 1990 strike, the evidence does not suggest that they would punish him today.

## IV.  IMPUTED POLITICAL OPINION

"'[A]n imputed political opinion, whether correctly or incorrectly attributed, may constitute a reason for political persecution within the meaning of the Act.'" Vasquez, 177 F.3d at 65) (quoting Ravindran, 976 F.2d at 760); see also Alvarez-Flores, 909 F.2d at 4.  There is no doubt that asylum can be

granted if the applicant has been persecuted or has a well-founded fear of persecution because he is erroneously thought to hold a particular political opinion.  The question is whether the evidence shows that an anti-government, or subversive, political opinion was attributed to Morales because of his involvement with the Cavisa labor union.  The same evidence already discussed is void of any suggestion or reasonable inference that Guatemalan authorities imputed a political opinion to Morales.  Morales argues that his brief participation in the union strike is a basis for an inference from which it could be found that the government authorities thought he was a subversive.

In addition to Morales' testimony about being followed by persons he thought, or assumed, were members of the Guatemalan Army there are only two other pieces of evidence bearing on this issue.  Both are Amnesty International reports. The first, dated February 9, 1990, states, <u>inter alia</u>: "Amnesty International has received reports that leaflets warning that the <u>leadership</u> of the [Cavisa] union would be held responsible if any damage were caused to the plant." (Emphasis added).  As we have already noted, Morales was not a leader of the union in any sense of the word and could not reasonably be thought to be

one.  Indeed, Morales himself denied that he was an active union member.

The second Amnesty International report is dated July 2, 1990.  It states that the Cavisa Union members occupied the factory for over four months.  It goes on to state that at the end of this period, the union members were "violently dislodged from the factory by regular and anti-riot police units" and that many of the workers were photographed while leaving the plant, and "made to fill in a form giving personal details, and then they were kicked and beaten with truncheons by the police."  The report also states that the workers continued to protest outside the factory and reportedly were further threatened.

There is no doubt that the Guatemalan government was, to say the least, hostile to the union.  The evidence is clear, however, that Morales was not in the factory when the authorities dislodged the union workers.  It is not reasonable to conclude that somehow he was tarred by the same anti-union brush that the government used against the workers that actively participated in the four month takeover of the factory.  No matter how generously we interpret the evidence in favor of Morales, it cannot be held to contribute any basis for a political opinion imputed by the Guatemalan authorities to Morales.

We understand and sympathize with Morales' desire to remain in the United States. The evidence and the applicable law in this case, however, compel us to rule otherwise. After careful review of the record, we find that there is substantial evidence to support the findings and rulings of the BIA and the evidence does not compel us to hold otherwise. Petition for review is **denied**. The BIA is **affirmed**.