# United States Court of Appeals
## For the First Circuit

---

No. 02-2200

PEGGY A. PIETERSON,

Petitioner,

v.

JOHN ASHCROFT,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before

Boudin, <u>Chief Judge</u>,
Lynch, <u>Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

---

<u>Jacqueline L. Gomes</u> on brief for petitioner.

<u>Edward C. Durant</u>, Attorney, Office of Immigration Litigation, <u>Linda S. Wendtland</u>, Assistant Director, and <u>Peter D. Keisler</u>, Assistant Attorney General, Civil Division, on brief for respondent.

---

April 13, 2004

---

**LYNCH**, **Circuit Judge**. Petitioner Peggy Pieterson is a native and citizen of Sierra Leone. She was admitted to the United States in July 1998 and overstayed her nonimmigrant fiancée visa; the INS commenced removal proceedings against her in March 1999. Pieterson conceded removability and sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An Immigration Judge denied each form of relief in June 1999, and the Board of Immigration Appeals affirmed in August 2002. Substantial evidence supports the BIA's conclusions; accordingly, we affirm.

## I.

Pieterson was the sole witness at her removal hearing before the IJ. The IJ found Pieterson credible when recounting factual events, but less credible when speculating as to the reasons underlying events. Pieterson's case relied on her claims that her mother was a political activist; that she assisted her mother and had suffered persecution and would suffer future persecution as a result of that assistance; that her Creole ethnicity meant that she had suffered persecution and would suffer future persecution; and that she would, in any event, suffer future persecution in the form of being raped and otherwise tortured.

Her testimony recounted the following facts and events. Pieterson, who is of Creole ethnicity, lived in Freetown, Sierra Leone. The Creoles are the smallest ethnic group in Sierra Leone;

they were the government administrators of the country during the British colonial period, which ended in 1961.

Pieterson's parents separated when she was four years old, and she has not seen or heard from her father since that time. Pieterson's mother lived with her in Sierra Leone until 1992 when she apparently emigrated to England. Pieterson did not leave with her mother. Her youngest sister was sent to a sponsor in England around 1985 and has been out of contact ever since. Pieterson's other sister was with her in Sierra Leone until 1997, when they left the country together. Pieterson received a Bachelor of Arts degree from the University of Sierra Leone in 1996 and speaks three languages. While in Sierra Leone, she worked for a hotel before going to college, and for a travel agency and then an airline after college.

Pieterson described her mother as a "political activist" in the National Democratic Party ("NDP"), a Creole-based party that sought more political power for Creoles. Her mother was an executive member of the party's campaign committee and held political meetings at her house before she left in 1992. Pieterson herself was not a member of the NDP, but she "actively participated" in it. She accompanied her mother during political activities such as campaigns and rallies, knew all of the party's executive members, and served refreshments at the meetings held in her home.

Various political parties had ruled Sierra Leone from 1961 until 1992.  In 1992, the National Provisional Ruling Council ("NPRC") came to power.  Pieterson claimed that once the NPRC gained control, the NDP was banned and the Creoles became subject to discrimination.  She testified:

> We [Pieterson and her family] constantly faced discrimination.  We had to live in a section of town where only mostly Creoles lived, and when I was at college, for example, I couldn't stay on campus, because I got threats all the time, partly because of my [m]other's affiliation with the Democratic Party, and partly because of our ethnic group, Creole, because there was this disgruntlement about them being the educationists and everything, and 90 percent of the country is illiterate, so they felt threatened by this, and they always thought that the only way they could back to the Creoles would be by power, by being in power.
>         . . . . we definitely had to live a life of, in, cowered in fear, because neighbors or even extended family with different political opinions always threw threats at us, and our house had been broken into lots of times, threats were made to us . . . .

Pieterson said that the threats to her and her family were ethnically and politically based and explained that the threats came from extended family members, neighbors, schoolmates, and her mother's co-workers.  She claimed that "they always said that if at any small time they had a chance to harm us, they were going to do it."

Pieterson's mother supervised the women's soccer team, which was sponsored by local businesses.  In 1992, her mother was jailed and questioned for two days for allegedly prostituting the women on the team.  Pieterson testified that her mother was

"framed." According to Pieterson, her mother claimed that she was jailed because of her ties to the NDP. Pieterson's mother did not discuss with her the details of the time she spent in jail. Sometime after this incarceration, Pieterson's mother left Sierra Leone. Pieterson suggested that her mother might have left the country to avoid being "incriminated," because a person could be killed or held in jail for years without trial in Sierra Leone. Her mother's departure also came shortly after the leader of the NDP was jailed over an article he had authored that was critical of the government. Pieterson has heard that her mother ended up in England, but she has had no contact with her since she left in 1992. Pieterson said that she did not leave the country with her mother because she did not "have the facilities" to do so at that time and was saving money. In the five-year period between her mother's departure and her own, Pieterson could point to no specific acts of persecution against her.

For a brief time in 1997, the Revolutionary United Front ("RUF"), an armed and disgruntled group of army affiliates, carried out a coup, overthrew the government, and embarked on a campaign of terror. Members of RUF and of the Armed Forces Revolutionary Council (AFRC) attacked Pieterson's town and raped and killed civilians in her Creole neighborhood. Pieterson watched the rebels loot homes and shops and she saw dead bodies in the streets. She stated that she had friends who were raped by RUF soldiers.

Pieterson and her sister became afraid to stay in their home as the violence intensified, so they hid in a cemetery for two nights to escape the danger and avoid being raped. She said that her neighborhood was particularly targeted by the RUF and AFRC soldiers because it contained many Creoles.

About a week after these attacks, Pieterson fled Sierra Leone with her sister. There was a mass exodus of people from Sierra Leone to Guinea, and the United Nations High Commission for Refugees had to intervene to make it possible for the refugees to cross the border to Guinea. Pieterson's sister eventually went her own way with her fiancé and son, and Pieterson does not know where she is now.

Pieterson initially stayed at a refugee camp in Guinea but discovered that RUF soldiers were entering the camp pretending to be refugees. The RUF soldiers were looking for people who had fled from Sierra Leone and were also taking food and supplies from the camp. Pieterson called Melsome Nelson-Richards, a naturalized citizen of the United States whom she had befriended and had a relationship with while he was doing research in Sierra Leone for the United Nations. She asked him to send her money so that she could go to a refugee camp on the Ivory Coast. Richards sent her money and, after a week at the Guinea camp, Pieterson moved to the refugee camp on the Ivory Coast, where she stayed for a year.

Pieterson testified that she learned from the new arrivals to the refugee camps that some of those who had tried to return to Sierra Leone (because of the deplorable conditions in the camps) had been killed by rebels and that most of those who did return found their homes destroyed. Petitioner learned that her own home had been burned down when a girl who had lived in her neighborhood showed her a picture of the destroyed house a few months later. Pieterson said that she has heard a lot of stories about people who were "harassed and tortured and held under arrest without any . . . reason" upon returning to Sierra Leone.

Pieterson and Richards decided to marry, and Richards filed for her to come to the United States as his fiancée. She entered this country in July 1998 but left Richards just three weeks later. Pieterson explained that he kept her in the house against her will and abused her, sexually and otherwise. She fled from him and applied for asylum on August 11, 1998.

In her application for asylum, Pieterson asserted that she would be vulnerable to rape or torture upon return to Sierra Leone because of her mother's association with the NDP. She testified that she fears persecution in Sierra Leone because of her ethnicity and her mother's political affiliation, and she claims that RUF soldiers will target her if she returns there. Pieterson admits that she was never physically harmed, detained, or arrested in Sierra Leone.

In her oral decision, the IJ denied Pieterson's applications for asylum and withholding of removal, concluding that Pieterson had failed to establish past persecution or a well-founded fear of future persecution on account of her political opinions or ethnicity.[1] The IJ emphasized that there was no corroboration for Pieterson's claim that her mother had, for political reasons, been framed on the charge of prostituting soccer players. The IJ also noted that Pieterson's mother had not even been present in Sierra Leone since 1992. As a result, the IJ found it unlikely that Pieterson would be targeted on account of her mother's political activities. As for Pieterson's own political activities, the IJ found that they were limited, low profile, and, since her mother's departure, nonexistent.

Citing a 1996 Profile of Asylum Claims, the IJ concluded that the civil unrest in Sierra Leone did not appear to be motivated by ethnic or political conflict. The evidence suggested that no particular group of persons was being singled out; the looting and burning of houses and shops did not target persons of

---

[1] The IJ noted that because Pieterson entered the United States after November 4, 1997, she was not eligible for the temporary protected status that is available to certain nationals of Sierra Leone. The IJ had determined at an earlier proceeding that Pieterson would be ineligible for voluntary departure if she proceeded to an asylum hearing because she had not been in the United States for more than one year. On appeal, Pieterson challenges neither of these rulings.

-8-

particular ethnicities or political beliefs. The IJ pointed out that civil conflict and anarchy alone do not establish grounds for asylum, nor do insults or discrimination alone.

The IJ also denied CAT protection, stressing that Pieterson was never harmed or detained. The IJ acknowledged Pieterson's fear of rape, but observed that rape was one of the ravages of the civil conflict in Sierra Leone; there was no indication that Pieterson would be any more vulnerable to rape than others because of her political opinion, her Creole ethnicity, or her family affiliation.

The BIA affirmed the IJ's decision in a brief opinion and noted that it agreed with the reasoning underlying the IJ's conclusions that the respondent failed to satisfy her burden of proof for proving eligibility for asylum or withholding of removal. It further held that Pieterson had not established eligibility for relief under the CAT because she had not shown that it was more likely than not that she would be harmed "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity" if returned to Sierra Leone. The BIA noted that the existence of a pattern of severe violations of human rights does not in itself constitute a sufficient ground for concluding that a particular person would be in danger of being subjected to torture as defined by the CAT.

We review the BIA's denial of Pieterson's asylum claim under the deferential substantial evidence standard.[2] INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003). The BIA's finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it. Elias-Zacarias, 502 U.S. at 481 & n.1; Albathani, 318 F.3d at 372.

An asylum applicant bears the burden of establishing that she fits within the statutory definition of refugee, 8 U.S.C. § 1101(a)(42)(A), and thus qualifies for asylum consideration. 8 C.F.R. § 208.13(a). Carrying that burden involves proving "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see 8 C.F.R. § 208.13(b); Khem v. Ashcroft, 342 F.3d 51, 53 (1st Cir. 2003).

To establish a well-founded fear of future persecution based on one of the five statutory grounds, an asylum applicant must demonstrate that her fear of persecution is both genuine and objectively reasonable. Khem, 342 F.3d at 53; Guzman v. INS, 327

---

[2] Where, as here, the BIA issues an opinion that upholds an IJ's decision and states that the BIA agrees with the reasons supporting the IJ's determinations, we treat the IJ's reasoning as if it were articulated by the BIA in the first instance. See Chen v. INS, 87 F.3d 5, 7-8 (1st Cir. 1996).

F.3d 11, 16 (1st Cir. 2003) ("Both a subjective and objective component must underlie a claim of a well-founded fear of future persecution.") (internal quotation marks omitted). To satisfy the "objectively reasonable" component of the test, an applicant must usually "provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution." 8 C.F.R. § 208.13(b)(2)(iii); see Guzman, 327 F.3d at 16. But an applicant need not provide such evidence if she instead (1) "establishes that there is a pattern or practice in . . . her country . . . of persecution of a group of persons similarly situated to [her] on account of [one of the five statutory grounds]" and (2) "establishes . . . her own inclusion in, and identification with, such group of persons such that . . . her fear of persecution upon return is reasonable." 8 C.F.R. §§ 208.13(b)(2)(iii)(A) and (B).

Pieterson's arguments on appeal boil down to a claim that the IJ and the BIA did not properly evaluate her evidence of a well-founded fear of persecution. Pieterson's primary argument is that even if she did not provide sufficient evidence that she would be singled out for persecution upon return to Sierra Leone, she did satisfy prongs (A) and (B) of 8 C.F.R. § 208.13(b)(2)(iii) by showing a pattern of persecution of Creoles and members of the NDP in Sierra Leone.

-11-

Substantial evidence supports the IJ's determination that there was no proven nexus between the violence in Sierra Leone and Pieterson's ethnicity and political beliefs. The dangers that Pieterson faced in Sierra Leone were the result of the violent civil conflict there, and Pieterson did not distinguish the dangers she faced from the dangers faced by other residents in Freetown and throughout Sierra Leone. Her claim that Creoles and NDP members were specifically targeted is substantially undermined by two reports from the United States Department of State. The Department's 1996 "Profile of Asylum Claims and Country Conditions" for Sierra Leone asserts that "[t]he conflict in Sierra Leone . . . does not appear to be based on ethnic, territorial or political factors. . . . . [N]o particular group appears to be singled out." And the Department's "Sierra Leone Country Report on Human Rights Practices for 1998" states that "[e]thnic differences . . . did not appear to contribute appreciably to the RUF rebellion, the 1997 coup, or the civil conflict during the year. There was no identifiable ethnic or regional base of voluntary popular support for the rebels, who controlled territory by terror and coercion rather than by popular consent." Thus, although Creoles and members of the NDP were among those terrorized by RUF, the reason appears to have been because they were part of a much larger group of people who did not support RUF, rather than because of any group-specific characteristic.

-12-

Absent evidence of more specific targeting of a particular group on account of one of the five statutory grounds, 8 C.F.R. § 208.13(b)(2)(iii) is not satisfied. The IJ correctly held that the existence of civil conflict alone does not establish grounds for asylum. Velasquez-Valencia v. INS, 244 F.3d 48, 51 (1st Cir. 2001) ("Congress has chosen to define asylum as limited to certain categories; . . . it has not generally opened the doors to those merely fleeing from civil war."); Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999) ("Danger resulting from participation in general civil strife, without more, does not constitute persecution."). The IJ also correctly held that the Sierra Leone government's alleged discrimination against Creoles does not, in and of itself, establish grounds for asylum. Discrimination is not the equivalent of persecution; "[t]o qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering." Khalil v. Ashcroft, 337 F.3d 50, 55 (1st Cir. 2003) (quoting Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000)).

Pieterson's efforts to show that she would be individually targeted for persecution on account of her own political beliefs or on account of her mother's political affiliation also fall short. First, the IJ's determination that Pieterson's political activities were limited and low profile and thus unlikely to lead to persecution is well-supported. Pieterson

did little more than accompany her mother at NDP events and serve refreshments at her mother's NDP meetings. And significantly, there is no evidence that Pieterson engaged in any political activity or was associated with the NDP in any way once her mother left the country in 1992, five years before she herself left.

Second, and relatedly, the record does not compel the conclusion that Pieterson would be targeted for persecution on the basis of her mother's NDP affiliation and political activities. The only evidence that Pieterson's mother was ever targeted for persecution -- the allegedly contrived charge that she prostituted soccer players -- was deemed unreliable speculation by the IJ, who reasonably noted that there was no corroboration for the theory that she was framed. Cf. Aguilar-Solis, 168 F.3d at 571 ("[W]hen a hearing officer who saw and heard a witness makes an adverse credibility determination and supports it with specific findings, an appellate court ordinarily should accord it significant respect."). Pieterson was never persecuted while her mother was in Sierra Leone, and her mother has not even been in the country for the last twelve years.

Third, and important to Pieterson's burden of proving the likelihood of being individually targeted, is the fact that she herself was never physically harmed, detained, or arrested while in Sierra Leone. The alleged threats and name-calling directed at her and her family by some classmates, co-workers, and others do not

equate to persecution, and certainly do not compel the conclusion that she would likely be subject to persecution upon return to Sierra Leone.

In sum, the record does not compel a rejection of the IJ's determination that Pieterson's fear is not objectively reasonable and thus that she did not establish a well-founded fear of persecution.

## IV.

For the same reasons, we conclude that the evidence does not compel the conclusion that petitioner is entitled to withholding of deportation. See Alvarez-Flores v. INS, 909 F.2d 1, 4 (1st Cir. 1990) ("[A] petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy" the standard for withholding of deportation.); Khem, 342 F.3d at 54. Similarly, the BIA's denial of CAT protection is supported by substantial evidence. See 8 C.F.R. § 208.16(c)(2); Guzman v. INS, 327 F.3d 11, 16 (1st Cir. 2003) (under the CAT, a petitioner has the burden of demonstrating that torture is more likely than not upon removal).

## V.

The BIA's denials of Pieterson's applications for asylum, withholding of removal, and protection under the CAT are **affirmed**.