**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

---

No. 03-2117

CHERNO JALLOH,

Petitioner,

v.

JOHN ASHCROFT, ATTORNEY GENERAL,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Joseph C. Lyons with whom Goulston & Storrs was on brief for petitioner.
Leslie Cayer Ohta, Trial Attorney, with whom Peter D. Keisler, Assistant Attorney General, and Mark C. Walters, Assistant Director, were on brief for respondent.

---

July 7, 2004

---

**COFFIN**, <u>Senior Circuit Judge</u>.  Petitioner Cherno Jalloh, a citizen of Sierra Leone, was admitted to the United States on a non-immigrant visa in September 1998.  Eight months later, Jalloh applied for asylum or, in the alternative, withholding of removal, on the basis of a well-founded fear of persecution on account of political opinion.  An Immigration Judge (IJ) denied the petition and the Board of Immigration Appeals (BIA) affirmed.  The IJ relied heavily on the determination that, as a result of having submitted fraudulent identity documents, Jalloh was not a credible witness.  The BIA, although it reversed the adverse credibility finding, nevertheless adopted the IJ's conclusion that Jalloh failed to demonstrate either past persecution or a well-founded fear of future persecution.

On appeal, Jalloh alleges that the evidence presented below - particularly in light of the restoration of credibility - compels a conclusion that he was eligible for asylum or, in the alternative, that he is entitled to withholding of removal.  The proceedings below, however, leave us without an adequate basis to decide whether petitioner's evidence merits denying or granting any form of relief because the BIA did not fully consider the effect of the restoration of credibility on the merits of petitioner's claim and also assigned him an incorrect burden of proof.  We therefore vacate the BIA's order and remand for further analysis of

petitioner's application in light of his restored credibility and under the proper evidentiary standard.

## I. **Background**

Petitioner's application for asylum is predicated on the brutal murders of his family and the destruction of the family home, allegedly by a rebellious faction of the Sierra Leonean military.[1]  The backdrop for this tragedy is the calamitous history of Sierra Leone, plagued by civil strife since 1991 and beset by abject poverty for decades prior.  After several years of military rule, a civilian government was elected in March 1996.  This did not end the struggle for power, however, and two formerly warring factions - ousted military members known as the Armed Forces Revolutionary Council (AFRC) and an independent rebel group known as the Revolutionary United Front (RUF) - cooperated in an effort to destabilize the elected regime.  The terrorizing of civilians, aimed at discouraging participation in and support for the government, figured prominently in AFRC and RUF tactics.

Throughout the years of violence, civilians were literally and figuratively caught in the crossfire and, as a result, established

---

[1]The petitioner's burden for demonstrating eligibility for asylum is lower than the burden for withholding of removal. INS v. Stevic, 467 U.S. 407, 430 (1984); Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003) (observing that "[b]ecause the 'more likely than not' standard for withholding deportation is more stringent than that for asylum, a petitioner unable to satisfy the asylum standard fails, *a fortiori*, to satisfy the former").  We therefore focus our inquiry on whether the evidence presented by Jalloh meets the lower threshold for asylum.

militia defense forces to protect themselves. Jalloh's father was a village elder and, although not a member, offered support to one such group known as the Kamajors.[2] In addition to offering protection, the Kamajors advocated for a democratically elected government and, after the election in 1996, lent their support to the elected civilian government.

On December 2, 1996, when Jalloh was 22 years of age and a student at the government secondary school in the town of Kenema, the school day was interrupted by the sound of gunshots.[3] Fleeing the building with other students, Jalloh headed towards his home in hope of finding safety. Unfortunately, upon reaching his neighborhood, he discovered that his house had been set on fire and that his father, mother, and younger sister had been shot dead. Jalloh found three other bodies, burned beyond recognition, in the ruins of the home and concluded that these were likely three of his four remaining siblings. Jalloh took cover in the home of a neighbor, Mr. Williams, who said he - Williams - had seen renegade

---

[2]An elected civilian government was in power at the time Jalloh's family was killed, but the regime was unstable. In May 1997 - five months after petitioner's family members were killed - a military coup succeeded in overthrowing the government. Civilian leadership was not re-established until February 1998, and even then fighting continued.

[3]Although the IJ cast doubt on the veracity of the story in its entirety, the BIA accepted Jalloh's account of the killings while finding insufficient evidence that the perpetrators were politically motivated. We therefore recite the course of events as recounted by Jalloh in his brief and his testimony before the IJ.

soldiers leaving the Jalloh home. A second man, also sheltering in Williams' house but unfamiliar to Jalloh, said that the house of another family that supported the Kamajors had also been burned. Jalloh thus concluded that his family had been targeted by insurgent forces as a result of his father's support for the Kamajors.

Fearing that he would suffer a similar fate, he fled to Sierra Leone's Waterloo Displacement Camp. After remaining there approximately five months, he came into contact with a former business partner of his father's, Abdul Traore. Traore offered to let Jalloh live with him in Guinea, and Jalloh agreed, thinking it safer than the refugee camp. While in Guinea, however, Jalloh also visited a second camp, the Moola Refugee Camp, apparently in order to secure various identification documents pertaining to his alleged refugee status. In September 1998, Traore and Jalloh traveled to the United States. At Traore's suggestion, Jalloh falsely procured a Guinean passport using his own photograph but the biographical information of Traore's deceased son. With this passport, Jalloh was admitted to the United States on a non-immigrant visa. Traore and Jalloh quickly lost contact, and Jalloh ended up in Boston with a friend who knew his family in Sierra Leone. In April 1999, Jalloh submitted an application for asylum and withholding of removal.

## II. **Applicable Law and Proceedings Below**

In support of his application for asylum, Jalloh was required to demonstrate that he was a refugee as defined by the Immigration and Nationality Act, namely, that he was unable or unwilling to return to Sierra Leone because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101 (42)(A). The regulations place this burden squarely on the asylum applicant. See 8 C.F.R. § 208.13 (2003). An applicant will be deemed to have met this burden if he establishes a well-founded fear of persecution that is both genuine - a subjective inquiry - and reasonable - an objective standard requiring that the applicant demonstrate that there is "a reasonable possibility of suffering such persecution if he or she were to return to that country," Id. at § 208.13 (b)(2)(B). See Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992) (requiring asylum applicant to show a reasonable fear of persecution "by credible, direct, and specific evidence").

We have characterized the appropriate inquiry as "whether a reasonable person in the asylum applicant's circumstances would fear persecution on account of a statutorily protected ground," Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999). An alien need not provide evidence of being singled out, however, if he or she can establish 1) "a pattern or practice in his or her country

-6-

of nationality" of the persecution of similarly situated persons and 2) "his or her own inclusion in, and identification with, such group of persons."  8 C.F.R. § 208.13 (b)(2)(iii)(A).  See also Knezevic v. INS, 367 F.3d 1206, 1213 (9th Cir. 2004) (citing Kotasz v. INS, 31 F.3d 847, 852 (9th Cir. 1994)) (asylum applicants not required to demonstrate that they would be "singled out" for persecution because "'persecution of an entire group can render proof of individual targeting entirely superfluous'").

Significantly, an asylum applicant's testimony alone - if deemed credible - could sustain this burden of proof.  8 C.F.R. § 208.13; Gailius v. INS, 147 F.3d 34, 45 (1st Cir. 1998). Furthermore, an asylum applicant may establish the persecutor's motive through circumstantial evidence.  Guzman v. INS, 327 F.3d 11, 15 (1st Cir. 2003); Ramirez Rivas v. INS, 899 F.2d 864, 869 (9th Cir. 1990) ("Evidence of the motive of a persecutor is hard to come by . . . . Circumstantial evidence, of course, is evidence, not 'no evidence,' as the Service asserts.").

The IJ denied Jalloh's petition on two grounds: first, that he had not established that he was a refugee because he could not prove Sierra Leonean citizenship; second, that Jalloh did not establish "a well-founded fear of persecution because he was not credible."  Undergirding each of the two grounds was an adverse credibility determination stemming from Jalloh's submission of a fraudulent Sierra Leone identification card as part of his petition

-7-

for asylum.[4]  Jalloh claimed that at the time he submitted the card, he reasonably believed it to be valid.  At the hearing before the IJ, Jalloh explained that his father had originally secured an identification card for him, but that this card was lost.  Before his family's death, Jalloh became concerned about the increasing violence around Kenema and wanted to secure a replacement card in case he was forced to flee.  This necessitated a trip to Freetown, Sierra Leone's capitol.  Because ambushes of travelers were frequent, Jalloh paid someone to take the trip for him, and thus acquired his second card through this intermediary.  He testified that he had no reason to believe that the second card was fraudulent because it looked like all other identity cards he had seen.

The IJ, however, was not convinced, and, relying on Matter of O-D, 21 I&N Dec. 1079, 1083 (BIA 1998), noted that submission of at least one counterfeit identification document "generally discredits [petitioner's] testimony regarding asylum eligibility and specifically discredits his identity claim."  The IJ not only discounted Jalloh's testimony, but also accorded very little weight to expert testimony that supported his claim of citizenship, namely, that Jalloh was fluent in languages native to Sierra Leone

---

[4]Jalloh does not contest the testimony of a forensic analyst who concluded that the card was "concocted."  On this basis, the IJ concluded that Jalloh's claim of Sierra Leonean citizenship was not credible, and thus he could not establish a foundation for refugee status.

and was familiar with the culture generally and people specifically in a manner to be expected of a native.

The alternative ground for denying asylum - that Jalloh did not establish a well-founded fear of persecution because he did not demonstrate a causal connection between his family's political opinion and the feared persecution - also relied in part on the adverse credibility finding. In evaluating Jalloh's claim that insurgent forces were aware of his father's support of the Kamajors and thus targeted the family on account of political affiliation, the IJ again discounted Jalloh's testimony because he was not a credible witness and "therefore, his testimony as to what actually occurred is questionable at best." The court instead adopted the government's argument that Jalloh's family simply fell victim to the indiscriminate violence sweeping through the country.

The BIA, on the other hand, accepted Jalloh's explanation of the lost identification card and thus credited Jalloh's claim of citizenship.[5] The BIA noted more generally that "[t]he submission of the fraudulent document does not taint the respondent's veracity and credibility under Matter of O-D . . . because the respondent testified that he did not know the document was fraudulent." By virtue of its citation to Matter of O-D, it appears that the BIA may have intended the credibility reversal to affect not just the

_____

[5]As a further result of the restoration of credibility, the BIA reversed the IJ's finding that Jalloh had filed a frivolous application for asylum.

claim of citizenship, but "overall credibility" as well.[6] However, in reviewing the IJ's alternative ground for dismissal, the BIA did not address Jalloh's evidence - or the IJ's treatment of that evidence - in light of Jalloh's restored credibility. On the key issue of whether the family's murders had been on account of political opinion, the BIA offered a cursory review of the evidence as interpreted by the IJ and then concluded that Jalloh's claim of causation was simply "speculation."

### III. **Analysis**

We review the BIA's decision under a "substantial evidence" standard. Guzman, 327 F.3d at 15. Under this deferential standard, we will uphold the BIA if the decision is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). We will not reverse unless we determine that the record compels the conclusion that Jalloh is eligible for asylum. Aguilar-Solis, 168 F.3d at 565. We may remand, however, if the BIA's opinion fails to state "with sufficient particularity and clarity the reasons for denial of asylum." Gailius, 147 F.3d at 46 (citing Hartooni v. INS, 21 F.3d 336, 343 (9th Cir. 1994) (internal citations omitted)).

---

[6]Indeed, in Matter of O-D, not only had false documents been presented, but, as the BIA stated, "[I]n the absence of an explanation regarding such presentation, [the presentation] creates serious doubts regarding the respondent's overall credibility." Matter of O-D, 21 I&N Dec. at 1083.

At the outset, we note that when the BIA required Jalloh to prove a well-founded fear of persecution by showing that it was "more likely than not that his life or freedom would be threatened upon return to Sierra Leone," the BIA assigned Jalloh the wrong burden of proof.[7]  The "more likely than not" burden applies to withholding of removal, 8 C.F.R. § 208.16(b)(2)(ii), not asylum, which requires a lesser showing that the "fear of persecution upon return is <u>reasonable</u>,"[8] <u>Id.</u> at § 208.13(b)(2)(iii)(B) (emphasis added).  <u>Compare</u> <u>INS</u> v. <u>Cardoza-Fonseca</u>, 480 U.S. 421, 449 (1987) (describing as "inexorable" the conclusion that "to show a 'well-founded fear of persecution,' an alien need not prove that it is more likely than not that he or she will be persecuted in his or her home country"), <u>with</u> <u>INS</u> v. <u>Stevic</u>, 467 U.S. 407, 430 (1984) (requiring that an applicant for withholding of removal demonstrate

---

[7]Jalloh did not raise this issue on appeal, and the government did not acknowledge the misstep, but it is settled in this circuit that an appellate court has discretion, in exceptional cases, to relieve a party of forfeiture.  <u>See</u> <u>United States</u> v. <u>La Guardia</u>, 902 F.2d 1010, 1013 (1st Cir. 1990).  The BIA's error of law deviates from clear precedent of both the Supreme Court and this circuit and, therefore, should not escape our attention, particularly in a case where further proceedings will be necessary on remand.

[8]The confusion is further apparent in the BIA's conclusion that Jalloh "failed to prove entitlement to asylum."  As the Supreme Court explained in <u>INS</u> v. <u>Cardoza-Fonseca</u>, 480 U.S. 421, 441 (1987), asylum is discretionary relief and thus an applicant who demonstrates a well-founded fear of persecution is simply deemed "eligible" for asylum.  An applicant who meets the higher standard for withholding of removal, however, is "entitled" to relief.

-11-

"that it is more likely than not that the alien would be subject to persecution on one of the specified grounds," but specifically leaving open the required showing for an asylum applicant).  This legal error adds to the difficulty of reviewing the BIA's decision. The Board erroneously failed to consider whether Jalloh's evidence supports a reasonable fear of persecution sufficient to sustain an application for asylum, even if it does not demonstrate that Jalloh's likelihood of facing persecution is "more likely than not."  See Hernandez-Barrera v. Ashcroft, --- F.3d ---, --- (1st Cir. 2004) [No. 02-2513, slip op. at 27] (cautioning that the "INS cannot impose an evidentiary burden on the applicant that is not provided by and appears to be inconsistent with the statute or regulation") (internal citations omitted).  Moreover, despite its restoration of credibility to Jalloh, the BIA gave short shrift to his considerable evidence that he faced a well-founded fear of persecution on account of political opinion.[9]

Jalloh presented probative evidence that suggested a political connection between the violence suffered by his family and his father's political views.  His own testimony described how a known member of the Kamajors would visit the family home - located in a

---

[9]Jalloh's claim is actually based on his fear that the renegade soldiers and insurgents would impute his father's political support of the Kamajors to Jalloh himself, and thus target him for persecution.  Such imputed political opinion - even if incorrectly attributed to the asylum applicant - can satisfy the "on account of" requirement under the Act's definition of a refugee.  Morales v. INS, 208 F.3d 323, 331 (1st Cir. 2000).

section of the town controlled by the renegade soldiers - approximately twice each month to arrange for supplies of rice - paid for by Jalloh's father - to be picked up at various local stores. Jalloh explained that his father was a member of the village elders and that as a leader in the community, his political opinions - including his support of free elections and the Kamajors - would have been known.

Jalloh also testified to having been told that on the day his home was destroyed, the home of another family, known to have supported the Kamajors, was also burned. Such evidence of selectivity further buttresses Jalloh's claim that his family was targeted on account of political opinion. See Popova v. INS, 273 F.3d 1251, 1255, 1258 (9th Cir. 2001) (fact that, in an apartment complex, only petitioner's apartment was burned supported claim that petitioner was targeted on account of religious affiliation and political opinion); cf. Pieterson v. Ashcroft, 364 F.3d 38, 42-43 (1st Cir. 2004) (justifying denial of petitioner's claim in part on the fact that the evidence "suggested that no particular group of persons was being singled out; the looting and burning of houses and shops did not target persons of particular ethnicities or political beliefs") (emphasis added).

Documentary evidence in the form of news reports and country profiles from the United States Department of State and organizations like Amnesty International and Human Rights Watch

further substantiates Jalloh's claim that supporters of the Kamajors were targeted for persecution. Although the reports attest to the generalized violence characteristic of Sierra Leone's civil war and aftermath, there is also clear mention of attacks on Kamajors and purported collaborators in Kenema, the same city in which Jalloh's family lived. Significantly, the reported abuses were not confined solely to suspected members of the Kamajors, but also extended to citizens accused of simply supporting the group. Finally, Professor Rosalind Shaw, accepted by the IJ as an expert on the conditions of Sierra Leone, testified that both Jalloh's account of the killings and the targeted abuse of Kamajor supporters are consistent with her understanding of the pervasive situation in the country.

In addition, Jalloh provided evidence pertaining to the likelihood of his being identified and targeted for persecution should he return to Sierra Leone. He testified that he knew at least twenty young men from school and from playing soccer who joined the soldiers, and he explained that these men would not only be able to identify him, but would also be aware of his family's political affiliation. Jalloh's own testimony was corroborated by that of Professor Shaw, who offered her expert opinion that should Jalloh return to Sierra Leone, he was "more than likely" to be identified and persecuted.

The BIA acknowledged that the record contained evidence that "soldiers targeted Kamajors and supporters of Kamajors, and that the respondent's father was a supporter of the Kamajors," but then dismissed Jalloh's claim that his family had been killed on account of political opinion as "speculation." This cursory discounting of Jalloh's proffered testimony is - absent further explanation - inconsistent both with the BIA's determination that Jalloh was a credible witness and 8 C.F.R. § 208.13, which allows an applicant to prove motivation on his or her own testimony alone, absent other evidence to the contrary. See Shoafera v. INS, 228 F.3d 1070, 1075 (9th Cir. 2000) ("A bald assertion that [petitioner's] credible testimony was 'speculation' is insufficient. Some evidence or support for that conclusion must be offered."). Although we have clarified that a reviewing court need not accept the uncontradicted testimony of an asylum applicant as true if it is "internally inconsistent or belied by the prevailing circumstances," Aguilar-Solis, 168 F.3d at 570, the BIA has given us no indication that either of those qualifying characteristics is present here. The only analysis offered by the BIA was that "there is no evidence that the respondent's father was ever threatened or harmed on account of his political beliefs . . . or that other members of his family had been threatened or harmed." This, however, is a conclusory characterization of the record which, as we have noted, is too opaque to serve as the basis for decision.

Jalloh has offered evidence - his own testimony, international and governmental agency reports, and expert opinion - that his family was killed on account of his father's political affiliation with the Kamajors and that, furthermore, should he return to Sierra Leone, he may suffer a similar fate. Because the BIA reversed the IJ with respect to Jalloh's credibility, we need a more detailed explanation of why this evidence is insufficient. <u>Gailius</u>, 147 F.3d at 47 (explaining that remand is appropriate in asylum context when "a reviewing court cannot sustain the agency's decision because it has failed to offer legally sufficient reasons for its decision").

The combined effect of the credibility reversal and the assignment of the wrong burden of proof has left us without a sufficient basis to affirm the BIA, and we therefore vacate the order of the BIA and remand to determine whether the credible testimony offered by Jalloh establishes past persecution or a reasonable fear of future persecution on account of political opinion.

<u>Vacated and remanded</u>.