**Not for Publication In West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 07-1639

SAMUEL RUDDY KAMUH,

Petitioner,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,[*]

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

Before

Lipez, Circuit Judge,
Selya and Siler,[**] Senior Circuit Judges.

William P. Joyce and Joyce & Associates, PC on brief for petitioner.
Greg D. Mack, Senior Litigation Counsel, Peter D. Keisler, Assistant Attorney General, and Terri J. Scandron, Assistant Director, on brief for respondent.

June 11, 2008

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Michael B. Mukasey has been substituted for former Attorney General Alberto R. Gonzales as the respondent herein.

[**]Of the Sixth Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**. Samuel Ruddy Kamuh, a citizen of Indonesia, petitions for review of the denial by the Board of Immigration Appeals (BIA) of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). See 8 U.S.C. § 1252(a). After careful consideration, we deny the petition for review.

## I.

Kamuh entered the United States on December 8, 2002, on a nonimmigrant, six-month tourist visa. On November 13, 2003, he filed an application for asylum, claiming religious persecution. The Department of Homeland Security then served a Notice to Appear on Kamuh on January 29, 2004, charging him with overstaying his visa. See 8 U.S.C. § 1227(a)(1)(B).

At an immigration hearing on November 4, 2005 and in his written asylum application, Kamuh described himself as an active member of the Seventh Day Adventist Church and reported that his father was the pastor of their congregation in Indonesia.[1] Kamuh recounted four negative encounters that he had had in Indonesia with Muslims who were prejudiced against Christians. He also described other incidents involving violence against various family

---

[1]Kamuh's father, Evert, was granted asylum by a different immigration judge on July 17, 2006. Kamuh, who was 35 years old when he applied for asylum, was not and could not have been included in his father's application for asylum. See 8 U.S.C. § 1158(b)(3) (permitting an asylee's child to receive asylum); 8 U.S.C. § 1101(b)(1) (defining "child" as an "unmarried person under twenty-one years of age").

-2-

members.  The immigration judge (IJ) found Kamuh's testimony to be credible.

The first personal encounter took place in July 1999 in Ternate, where Kamuh had stopped over briefly while traveling by ship.  As Kamuh made his way back to reboard the ship, a fight broke out between one of the ship's guards and a man who had tried to enter the area through a fence.  The man and three others beat the guard, and rumors quickly swept through the crowd that Christians had killed a Muslim guard.  Shortly thereafter, two guards requested that Kamuh show them his national identification card, which identified him as a Christian.  One of the guards then punched Kamuh in the jaw.  Before the guard could hit him a second time, Kamuh ran toward the ship with the guards in pursuit.  He was able to lose them in the crowd and reboarded the ship without further incident.  The following morning, Kamuh learned that a group of people had killed a man on board the ship and thrown the body into the sea before leaving on their own boat.

The second incident occurred in July 2002 at the Kramat Jati Market in East Jakarta.  Kamuh and two friends happened to be at the market when an argument between a Christian and a Muslim salesman sparked a riot.  Kamuh testified that during the fighting, three men grabbed him and forced him to show them his national identification card.  The men then beat Kamuh for twenty to thirty minutes before he was able to flee to his car where his friends

-3-

were waiting for him. He reported that his face was bruised, his left eye injured, and his lip torn during the beating. After Kamuh left, police and soldiers arrived to end the riot and secure the marketplace.

The third encounter took place in September 2002, when a group of ten or twelve armed young men came to his apartment complex searching for a Christian. Kamuh testified that he locked the door to his apartment and hid while the Muslim men searched the complex. He reported that he observed through the window as the men dragged a Christian man into the soccer field in front of the building and beat him. Kamuh stated that police came and took the militants away before they reached his apartment.

The final encounter involving Kamuh occurred in November 2002. Kamuh stated that he was stopped in an alley by a group of young people after he left a Prayer Night at his church with friends. The group shouted insults at Kamuh and his friends for their Christian beliefs and threatened to kill them if they ever took that road again. Two weeks later, stones were thrown at him as he rode his motorcycle through the same alley. One stone passed in front of his face, narrowly missing him, and others hit his motorcycle. He did not stop and did not see who was throwing the stones. He also did not call the police, convinced that they would not follow up on his report because he is Christian.

Other members of Kamuh's family had similar encounters because of their religious beliefs. Kamuh's father, Evert, received death threats because of his position as a pastor in the Seventh Day Adventist Church. In April 2001, one of Evert's former students warned him that Muslim militants were planning to burn Evert's house; Evert called the police. Shortly thereafter, two men approached Evert on a bus and told him to stop "Christianizing" young Muslims through his English classes. The men also demanded that Evert pay them two million rupiahs for "teaching Christianity" to Muslim students.

In December 1998, Kamuh's brother Daniel was staying in Ambon, at a hotel, when religious rioting broke out in the city. The owner of the hotel told Daniel to stay in his room for his own safety. Daniel hid in the hotel for three or four days and then escaped with the help of police. Kamuh also reported that his sister was robbed by a group of men who stopped her on the street, ascertained that she was Christian, and then further harassed her. Additionally, in January 2002, Kamuh's uncle was hit in the stomach by a stone thrown by Muslim militants who had boarded his train looking for Christians.

Kamuh obtained his tourist visa to come to the United States on October 1, 2002. Following the November 2002 incident, he made the final decision to leave Indonesia and departed for the United States on December 7, 2002. Kamuh's father had preceded

him, arriving in the United States in 2001. Kamuh's brother Daniel and his mother have remained in Indonesia. Kamuh explained that Daniel is well protected by the American corporation for which he works and that his mother is periodically in hiding, but remains in Indonesia because she has been unable to obtain a visa.

Having heard this account, the IJ concluded that although Kamuh's testimony was credible, he had not established that the incidents he described rose to the level of past persecution or established an objectively reasonable fear of future persecution. The IJ also found that Kamuh had failed to establish that the Indonesian government was unwilling or unable to control the Muslim militants. The IJ further concluded that Kamuh did not qualify for withholding of removal or protection under the CAT, noting that these require a higher level of proof than the asylum claim.[2] The IJ granted Kamuh voluntary departure. Kamuh appealed to the BIA, which briefly stated its agreement with the IJ's conclusions and dismissed the appeal. This timely petition followed.

## II.

When the BIA adopts and affirms the IJ's ruling, but also discusses some of the bases for the IJ's opinion, we consider both the IJ's and BIA's opinions in our review. Zheng v. Gonzales, 475

---

[2]Kamuh offers no arguments with respect to his claims for withholding of removal or protection under the CAT. As a result, he has waived any right to judicial review of the denial of these claims. See Topalli v. Gonzales, 417 F.3d 128, 131 n.3 (1st Cir. 2005).

F.3d 30, 33 (1st Cir. 2007). We afford those opinions a high degree of deference, allowing the agency's findings of fact to stand "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

To establish eligibility for asylum, an alien must show that he "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see also Harutyunyan v. Gonzales, 421 F.3d 64, 67 (1st Cir. 2005). In order to establish that the mistreatment he has experienced or would experience upon return rises to the level of "persecution," the alien must show, inter alia, that the mistreatment was the "'direct result of government action, government-supported action, or government's unwillingness or inability to control private conduct.'" Ortiz-Araniba v. Keisler, 505 F.3d 39, 41 (1st Cir. 2007) (quoting Orelien v. Gonzales, 467 F.3d 67, 72 (1st Cir. 2006)); see also Da Silva v. Ashcroft, 394 F.3d 1, 7 (1st Cir. 2005) ("Action by non-governmental actors can undergird a claim of persecution only if there is some showing that the alleged persecutors are in league with the government or are not controllable by the government.").

The IJ determined that Kamuh had failed to show that the incidents he described, all of which involved violence by private citizens, were connected with either action or inaction on the part of the Indonesian government. As the IJ noted, the State Department's 2004 Country Reports on Human Rights Practices and the International Religious Freedom Report both indicate that the constitution of Indonesia provides for religious freedom. Both reports also conclude that the government generally respects this provision and that Christianity is officially acknowledged as one of several recognized religions. Although the Religious Freedom Report states that "[o]n some occasions, the Government tolerated the abuse of religious freedom by private groups or failed to punish perpetrators," the IJ reasonably concluded that this tolerance is not the norm. See Matter of A-M 23 I & N Dec. 737, 741 (BIA 2005) (noting that the 2002 Country Report for Indonesia "indicate[d] that incidents of harm related to religious or ethnic strife generally involved fellow citizens rather than the Government or Government agents, and that Government acquiescence [was] not the norm"). Indeed, the report goes on to detail the government's efforts to investigate various incidents of violence by militant Muslims aimed at Christians and to prosecute those involved.

Moreover, Kamuh's account of his own experiences in Indonesia demonstrates that the government was both willing and

-8-

able to respond when authorities were alerted to interreligious violence. See Ortiz-Araniba, 505 F.3d at 42 ("In determining whether a government is willing and able to control persecutors, we have explained that a prompt response by local authorities to prior incidents is 'the most telling datum.'" (quoting Harutyunyan, 421 F.3d at 68)). The police responded to several of the incidents Kamuh described: in December 1998, Kamuh's brother reportedly escaped from religious violence in Ambon with help from the police; in April 2001, Evert called police after learning of a plot to burn his house, and the house was not burned; in July 2002 when Kamuh was caught up in rioting in a market, the police quelled the violence after Kamuh had left; and, in September 2002, police arrived and took away the armed men who had come to Kamuh's apartment building before the men arrived at Kamuh's apartment.

Against this backdrop, the IJ reasonably concluded that Kamuh's insistence that the police "side with the militants" was unsubstantiated by the State Department reports and Kamuh's own testimony. Thus, we affirm the IJ's conclusion that Kamuh failed to establish the necessary connection between the mistreatment he experienced or would experience in the future and any action or inaction on the part of the Indonesian government. Without this governmental link, Kamuh cannot establish either past persecution or a well-founded fear of future persecution and his asylum claim necessarily fails.

**<u>Petition denied</u>**.