# United States Court of Appeals
## For the First Circuit

No. 09-1847

DAVID EDUARDO CASTAÑEDA-CASTILLO;
CARMEN JULIA DE LA CRUZ-CASTAÑEDA;
PIERA DINA CASTAÑEDA,

Petitioners,

v.

ERIC H. HOLDER, JR.,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF A FINAL ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Ripple,[*] and Lipez,
<u>Circuit Judges</u>.

William P. Joyce, with whom Joyce & Associates P.C., was on brief for petitioners.
Matt A. Crapo, Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, with whom Tony West, Assistant Attorney General, Civil Division, and Michelle Gorden Latour, Assistant Director, were on brief for respondent.

March 24, 2011

_____

[*] Of the Seventh Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  This is the latest round in a lengthy series of proceedings adjudicating petitioner David Eduardo Castañeda-Castillo's petition for asylum and withholding of removal.[1]  Castañeda's asylum claims have previously been before this court, having already been the subject of a 2006 panel opinion, Castañeda-Castillo v. Gonzáles, 464 F.3d 112 (1st Cir. 2006) ("Castañeda I"), as well as an en banc decision a year later, Castañeda-Castillo v. Gonzales, 488 F.3d 17 (1st Cir. 2007) ("Castañeda II").[2]  In Castañeda II, we vacated the decisions of the Immigration Judge ("IJ") and Board of Immigration Appeals ("BIA") applying the "persecutor bar" to Castañeda's asylum claims, and held that the persecutor bar could not be applied to block asylum claims absent a finding that the individual involved had actual knowledge that he or she was engaged in the persecution of others.  Castañeda II, 488 F.3d at 22.  We remanded the case for further proceedings.  The instant appeal is from the decision of

---

[1]  Castañeda's wife, Carmen Julia de la Cruz, and daughters, Piera Dina and Pía Maribel, are derivative applicants on Castañeda's original asylum application and, with the exception of Pía Maribel, who has since married a U.S. citizen, are part of this appeal. Because this case arises out of the lead petitioner's history in the Peruvian military, unless otherwise specified, "Castañeda" refers to David.

[2]  Castañeda raises claims pertaining to both asylum and withholding of removal.  Because the standard governing withholding of removal is stricter than that governing asylum, see Matter of Mogharrabi, 19 I. & N. Dec. 439, 440-41 (BIA 1987), the decisions below summarily dismissed Castañeda's withholding of removal claims upon dismissal of his asylum claims.  Therefore, our discussion also focuses on the asylum claim.

the BIA reviewing the IJ's decision on remand.  For reasons explained below, we conclude that the IJ and BIA adjudication of Castañeda's asylum petition was marred by legal error. Consequently, we again vacate the denial of Castañeda's asylum petition and remand for further proceedings.

## I.

The root of the controversy is Castañeda's role in a 1985 massacre of sixty-nine civilians in Accomarca, Perú during Perú's struggle with the Shining Path movement, a violent Maoist insurgent group that "is among the world's most ruthless guerrilla organizations." Castañeda I, 464 F.3d at 114 n.3.  What follows is an abbreviated summary of the facts and procedural posture of the instant appeal.  Readers seeking further details are advised to refer to our earlier 2006 panel decision, id. at 113-22.

In 1985, Castañeda was a military officer stationed in Perú's Ayacucho region, the birthplace of the Shining Path. Castañeda's duties included training and leading patrols.  In August of that year, Castañeda's patrol was ordered to assist in an operation in the remote village of Llocllapampa in the Accomarca region, which was believed to be a Shining Path stronghold.  The goal of the operation was to search for Shining Path guerrillas, between forty and sixty of whom were believed to be in the village. The operation involved four patrols: two would enter the village to conduct the search, while the other two would block escape routes.

Castañeda's patrol was one of the latter, and was assigned to guard a location on a path several miles from the village, through which fleeing militants would likely pass. Castañeda was therefore not present when the two patrols that entered the village, led by Lieutenant Riveri Rondón and Sub-Lieutenant Telmo Hurtado, proceeded to massacre dozens of civilians.[3] Castañeda testified that although he was in communication with the base commander via radio, he was not in communication with any of the other patrols, and did not know their radio frequencies so could not contact them in any event. Castañeda and his patrol remained in position until ordered to return home by the base commander; at no point during the operation did he or his men see anyone coming down the path, and no shots were fired by Castañeda or his patrol.

Castañeda testified that he did not learn of the bloodletting until three weeks later, when he heard on the radio that Hurtado had confessed to executing civilians. A few weeks later, in September of 1985, Castañeda was called to testify before a Peruvian Senate Human Rights Commission investigating the matter. The Commission noted that Castañeda's patrol was "not involved in any confrontations with fugitive civilians." Charges were subsequently filed in the Peruvian military courts against the leaders of all four patrol units, including Castañeda. He was

---

[3] It is unclear exactly how many civilians were killed; estimates range from twenty-five to sixty-nine. Id. at 117 n.12 (citing the report of a Peruvian Senate Human Rights Commission).

-4-

acquitted of all charges by the Appeals Division of the Supreme Council of Military Justice.  Hurtado, who was the only person convicted by the tribunal, was thereafter released under a general amnesty passed by former President Alberto Fujimori.

As a result of the publicity surrounding the events at Accomarca, Castañeda's name became linked to the massacre.  El Nacional, a Peruvian newspaper apparently sympathetic to the Shining Path, published Castañeda's name in connection with the killings as early as October of 1985.  Castañeda and his family subsequently began to receive death threats from the Shining Path.[4] On June 26, 1986, Castañeda was attacked near his home, while dressed in civilian clothes.  The attackers left behind leaflets stating "spilled blood will never be forgotten."  Later, in March of 1987, a group of gunmen attempted to stop the cab in which Castañeda was riding, but Castañeda and the driver were able to escape.  Undeterred, the next month the Shining Path attacked a restaurant where Castañeda and several other military officers were

---

[4] Castañeda states that he received death threats on approximately twenty occasions.  According to Castañeda, the threats contained messages such as "[t]he miserable dog who killed our soldiers of the New Popular Republic and his family be executed. [Sic] Long live the PCP-SL.  Long live President Gonzalo," "[a]ll the dogs of the army who fought against us will die. Long live President Gonzalo!," and "Leopard, you dog, your head will be hung on a pole for having killed our People's Army's soldiers.  Long live the armed battle!"  "President Gonzalo" is the nom-de-guerre of Manuel Rubén Abimael Guzmán Reynoso, the head of the Shining Path during the time period relevant to this case.  He has since been imprisoned by the Peruvian authorities.  "Leopard" was Castañeda's military code name.

having lunch. A bomb exploded minutes after he left, killing two military officers and "five or six" civilians.

The Shining Path did not limit its attacks to Castañeda alone. It also targeted his family. The Shining Path detonated explosives near his parents' home, leaving behind death threats that referred to his military code name, and contained veiled references to the killings at Accomarca. In 1989 an attempt was made to kidnap his daughter Pía from her school. The attack was foiled by the vigilance of the school's director, who subsequently requested that Pía be removed from the school because her presence endangered the other students.

Finally, in October of 1990, Castañeda's neighbor and colleague was murdered at home, in front of his family. Like Castañeda, he was a member of the military who had been involved in the counter-insurgency, and had also been receiving death threats from the Shining Path over a number of years. After this incident, the Castañedas moved frequently, staying with relatives, but never together and never for more than a few days at a time. Castañeda received an honorable discharge from the Peruvian military on June 4, 1991, and the family fled for the United States shortly thereafter.

The Castañedas arrived in Miami on August 29, 1991 on B-2 visitor, non-immigrant visas. Castañeda applied for asylum on January 19, 1993, naming his wife and daughters as derivative

applicants.  After being charged with removability under the Immigration and Nationality Act ("INA") § 101(a)(15), he conceded removability on May 1, 2000.  An initial adverse decision by the IJ on October 4, 2004 was subsequently affirmed by the BIA on September 9, 2005.  The BIA "affirmed the [IJ's] adverse credibility finding and stated that, even if Castañeda were credible, he had assisted or otherwise participated in the persecution of others." Castañeda I, 464 F.3d at 121.  The Department of Homeland Security ("DHS") subsequently took Castañeda into custody, where he remained for approximately the next five years, until August 17, 2010, when he was ordered released upon posting $15,000 bail.

Castañeda appealed to this court.  An initial panel decision found that the BIA's adverse credibility determination, as well as its finding that Castañeda had engaged in persecution of others, was not supported by substantial evidence. Castañeda I, 464 F.3d at 121-22.  The DHS petitioned for rehearing.  The court, this time sitting en banc, held that the persecutor bar, which excludes former persecutors from eligibility for asylum, requires that the asylum seeker have prior or contemporaneous knowledge that the effect of his or her actions is to assist in persecution. See Castañeda II, 488 F.3d at 21-22; INA § 208(b)(2)(A)(i), codified at 8 U.S.C. § 1158 (persecutor bar for asylum); INA § 241(b)(3)(B)(i), codified at 8 U.S.C. § 1231 (persecutor bar for withholding of

-7-

removal). Accordingly, we vacated the BIA's decision and remanded to allow the BIA to determine whether Castañeda was credible in claiming that he did not learn of the Accomarca massacre until long after he had returned from his patrol. In addition, we rejected the IJ and BIA's adverse credibility determinations as to Castañeda's denial of prior or contemporaneous knowledge of the massacre as "wholly speculative and without record support," and remanded for further consideration. Castañeda II, 488 F.3d at 24.

On remand, the IJ again denied Castañeda's renewed application for asylum and withholding of removal, holding (1) that he had not met his burden of proving that he was not a persecutor, (2) that he had not demonstrated that he was persecuted on account of his membership in a particular social group or for a political opinion, and (3) that he did not have an objectively reasonable fear of future persecution. On appeal, the BIA reversed the IJ as to point (1), noting that "there is too slim a reed of evidence upon which to conclude that the respondent had prior or contemporaneous knowledge of the Accomarca massacre," and thus concluded that the persecutor bar did not apply. However, the BIA upheld the IJ's decision that Castañeda was materially ineligible for asylum on grounds (2) and (3). The BIA found that even if Castañeda was a member of a particular social group, the Shining Path did not target him for that reason but rather for revenge for his alleged involvement in Accomarca. Therefore, the burden was on

Castañeda to prove both that he had a subjectively genuine fear of future persecution, and that such fear was objectively reasonable. The BIA held that Castañeda failed to carry this burden, and so denied his asylum petition.  This appeal followed.

## II.

There is an additional wrinkle that sets Castañeda's case apart from the typical asylum case, and which we must address before reaching the merits.  On September 3, 2008, the government of Perú issued an order seeking Castañeda's extradition to face charges stemming from the incidents at Accomarca.  A year and a half later, on March 9, 2010, the United States Attorney for the District of Massachusetts acted on the extradition request by issuing a complaint seeking the provisional arrest of Castañeda. In light of the ongoing extradition proceedings, the United States has contended that there should be no merits adjudication of Castañeda's asylum claims until the extradition proceedings are resolved.[5]  The United States therefore declined, both in its appellate brief and at oral argument, to address the merits of any of the issues raised by Castañeda, insisting only that the case should be held in abeyance pending resolution of the extradition proceedings.

---

[5]  The United States initially sought remand so that the BIA could "further consider Petitioners' asylum and withholding of removal claims in light of Sompotan v. Mukasey, 533 F.3d 63 (1st Cir. 2008), or to dispose of the case on whatever other grounds the Board may deem fit."

The government raises two main arguments to support its position. The first is its claim that the BIA itself has a policy of holding asylum cases in abeyance once extradition proceedings are initiated. The government cites Matter of Pérez-Jiménez, 10 I. & N. Dec. 309 (BIA 1963), as evidence for this claim. In Pérez-Jiménez, the BIA considered a motion by the Immigration and Naturalization Service ("INS") to withdraw the outstanding deportation order against Pérez-Jiménez, the former president of Venezuela, in light of Venezuela's extradition request, as well as a competing motion by Pérez-Jiménez to reopen the deportation proceedings despite the pending extradition. The BIA sided with the INS, noting that "in view of the extradition proceedings, further deportation proceedings would serve no useful purpose and may unnecessarily and improperly complicate the extradition proceedings." Id. at 311-12.

However, the government's claim that Pérez-Jiménez reflects a firm "policy" on the part of the BIA is undermined by the fact that the BIA explicitly declined to apply Pérez-Jiménez to the present case. In keeping with its efforts to prevent an adjudication on the merits of Castañeda's asylum claims, the United States filed a motion with the BIA on June 10, 2010 to re-open the proceedings against Castañeda and to hold them in abeyance until the resolution of the extradition proceedings, citing Pérez-Jiménez. This would have meant that there would be no final agency

-10-

determination for us to review, and so we would no longer have had jurisdiction over the case.  The BIA denied the request.  The BIA explicitly noted that Pérez-Jiménez was not applicable to the circumstances at hand because, in this case, "the removal proceedings are administratively final," and "[t]here are no pending matters before the Board nor are the parties seeking the reopening of proceedings to pursue matters within our jurisdiction."  This suggests that the government reads too much into Pérez-Jiménez.

The second contention the government raises is that "any decision addressing the merits" of the asylum claim would "unduly complicate or interfere with the sensitive foreign policy considerations inherent to the ongoing extradition proceedings." However, the government failed, both in its appellate brief and when pressed at oral argument, to provide anything beyond vague hand-waving about the nature of these unspecified foreign policy consequences.[6]  In any case, the argument that adjudicating the asylum claim would somehow "complicate" the extradition proceedings would have more legs if a decision on the former had legally preclusive effect on the latter.  But, as the United States

---

[6] As the government concedes, the Secretary of State, who, under 18 U.S.C. § 3186, is ultimately responsible for deciding whether to honor an extradition request, had made no representations either before this court or the BIA that a decision on the merits of Castañeda's asylum claim would in any way constitute an embarrassment to the foreign policy of the United States.

-11-

concedes, asylum and extradition proceedings are "separate and distinct," in the sense that "the resolution of even a common issue in one proceeding is not binding in the other."  Indeed, the government not only concedes this point, it positively stresses it, noting that in light of the current United States-Perú extradition treaty's silence on the issue, the Secretary of State may, in her discretion, order the extradition of an individual to Perú even if that individual is granted asylum.

The government points out that when asylum and extradition "proceedings are contemporaneous, they are related inasmuch as they both involve a determination as to whether a foreign national will be required to return to his country of nationality."  This argument ignores the fact that asylum and withholding of removal proceedings are governed by different sources of statutory authority than extradition proceedings.  The law governing asylum and withholding of removal was initially established by Congress in sections 208 and 241(b)(3), respectively, of the Immigration and Nationality Act (INA) of 1952, subsequently amended by the Refugee Act of 1980.  See Act of March 17, 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980), codified at 8 U.S.C. §§ 1158 and 1231(b)(3).  "In enacting the Refugee Act, Congress sought to bring United States refugee law into conformity with the 1967 United Nations Protocol Relating to the Status of Refugees . . . to which the United States acceded in 1968."

-12-

<u>Barapind</u> v. <u>Reno</u>, 225 F.3d 1100, 1106 (9th Cir. 2000) (citing United Nations Protocol Relating to the Status of Refugees art. 33, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577); <u>Matter of Acosta</u>, 19 I. & N. Dec. 211, 219 (BIA 1985) (same). Extradition, in contrast, is governed by 18 U.S.C. § 3184, which in turn rests on "treat[ies] or convention[s] for extradition between the United States and any foreign government." <u>Id.</u> In this case, the relevant treaty is the bilateral extradition treaty between the United States and Perú. <u>See</u> Extradition Treaty, U.S.-Perú, July 26, 2001, S. Treaty Doc. 107-6. In short, although asylum and extradition proceedings are related insofar as they both bear on whether Castañeda will ultimately be forced to return to Perú, they are rooted in distinct sources of law, governed by procedures specified in distinct statutory regimes, and responsive to different sets of policy concerns.

It bears emphasis that <u>Castañeda's asylum claims have been pending for eighteen years</u>. Moreover, Castañeda's wife and daughter are derivative beneficiaries of the claim, with the consequence that whatever ultimately happens to Castañeda, <u>their</u> interests would be seriously prejudiced by further postponing a merits adjudication until the resolution of potentially quite lengthy extradition proceedings.[7] To this we add the real

---

[7] Significantly, Magistrate Judge Dein indicated in her order releasing Castañeda on bail that, "[g]iven the history of the case to date, the inaccuracies in the [extradition] charges and the

-13-

possibility that the charges underlying the extradition request will ultimately be dismissed under Peruvian double jeopardy principles, as Castañeda was found not guilty of these charges by a duly constituted court of Perú, the decision of which was confirmed by Perú's highest tribunal.[8]  For these reasons, we find that the government's unhelpful invocation of "foreign policy considerations" is not sufficient to defeat the specific and compelling interests in favor of reaching the merits sooner rather than later.  Because the government has put all its eggs in this rather dubious basket, and consequently has failed to in any way address the merits of Castañeda's asylum claims, we are left "to decide the matter with only [the appellant's] arguments to guide us."  Casco Indem. Co. v. R.I. Interlocal Risk Mgmt. Trust, 113 F.3d 2, 3 (1st Cir. 1997).

---

complexity of the evidence which the parties will likely seek to introduce even in the most stream-lined extradition hearing, Castañeda-Castillo does not face a 'normal passage of time inherent in the litigation process,' but, rather, a far more extensive process which rises to the level of special circumstances." Memorandum and Order on Application for Bail at 23, In the Matter of the Extradition of David E. Castañeda-Castillo, No. 10-mj-1013 (D. Mass. filed Aug. 17, 2010) (citing United States v. Kin-Hong, 83 F.3d 523, 525 (1st Cir. 1996)).

[8]  See Constitución Política del Perú 1993, art. 139, § 13; and Code of Criminal Procedure art. 5 (Perú), cited in Application for Bail at Exhibit 21, In the Matter of the Extradition of David E. Castañeda-Castillo, No. 10-mj-1013 (D. Mass. filed Aug. 17, 2010) (establishing res judicata as an "exception" to penal action). Principles of international law also support this proposition; see Restatement (Third) of Foreign Relations Law § 476 (1987) and cmt. (b); International Covenant on Civil and Political Rights, art.14, § 7, Dec. 19, 1966, 999 U.N.T.S. 171.

"In evaluating a BIA denial of asylum, our review is aimed at determining whether the decision is supported by substantial evidence in the record." Halo v. Gonzales, 419 F.3d 15, 18 (1st Cir. 2005); see also INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). The BIA's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Pietersen v. Ashcroft, 364 F.3d 38, 40 (1st Cir. 2004). However, although we "give deference, where appropriate, to the agency's interpretation of the underlying statute in accordance with administrative law principles," Meguenine v. INS, 139 F.3d 25, 27 (1st Cir. 1998), review of the BIA's legal conclusions is de novo. Manzoor v. U.S. Dep't of Justice, 254 F.3d 342, 346 (1st Cir. 2001). Because the BIA conducted an "independent evaluation of the record and rested its decision on a self-generated rationale," the focus of judicial review is on the BIA's decision. Zhou Zheng v. Holder, 570 F.3d 438, 440 (1st Cir. 2009).

Asylum eligibility can be established in one of two ways. The alien may demonstrate either past persecution or a well-founded fear of future persecution due to "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); Mediouni v. INS, 314 F.3d 24, 27 (1st Cir.

-15-

2002).  To establish a well-founded fear of future persecution, the alien must establish that his or her fear is both subjectively genuine and objectively reasonable.  Jiang v. Gonzales, 474 F.3d 25, 30 (1st Cir. 2007).  On the other hand, if the alien establishes that he or she suffered past persecution based on one of the indicated grounds, then he or she is presumed to have a well-founded fear of future persecution which the government may rebut by a preponderance of the evidence.  Fergiste v. INS, 138 F.3d 14, 18 (1st Cir. 1998); 8 C.F.R. § 208.13(b)(1)(i).

**B.**

As we have noted, in its most recent decision, the BIA reversed the IJ's finding that Castañeda was ineligible for asylum on account of the persecutor bar, but affirmed the IJ's finding that Castañeda had not established the requisite nexus between his past persecution and a statutorily protected ground, and that Castañeda had not established a well-founded fear of future persecution.  In rejecting Castañeda's claim of past persecution, the BIA noted that,

> even assuming that Peruvian military officers whose names became associated with the Accomarca massacre constitutes a cognizable particular social group . . . the respondent has not adequately shown that his military rank is the motivating factor behind the Shining Path's actions in this matter. Rather, it appears that revenge is the motivation behind the Shining Path's actions, with public military rank being a necessary component, but not the motivating factor. (Emphasis added.)

-16-

Castañeda argues that the BIA erred in so ruling.  We agree.

As Castañeda rightly points out, to say that the Shining Path's assaults were motivated by "revenge" is tantamount to saying that they were motivated by the fact that he was a military officer that the group viewed as responsible for the Accomarca massacre. After all, Castañeda's status as an officer associated with Accomarca is precisely what explains the Shining Path's desire for revenge.  Furthermore, as the leader of one of the army patrols associated with that incident, his status as an officer would make him particularly likely to become a target of the Shining Path's violence.  We thus fail to discern a significant distinction between the proposition that the Shining Path targeted Castañeda because they wanted revenge for his alleged role in Accomarca, and that the Shining Path targeted him because he was a member of the group of former military officers that they believed to have been involved in Accomarca.  On the facts of this case, the Shining Path's attempts to exact retribution were not only consistent with persecution on the basis of group membership, but in fact constituted such persecution.  The BIA's conclusion to the contrary does not withstand scrutiny.  Consequently, we hold that the BIA erred in dismissing Castañeda's asylum claims on this basis.

Resolving this error forces us to consider whether, as the BIA assumed without deciding, "Peruvian military officers whose names became associated with the Accomarca massacre" constitutes a

-17-

cognizable particular social group. Because the BIA has not yet decided this question, we adhere to the "ordinary 'remand' rule," Gonzales v. Thomas, 547 U.S. 183, 186 (2006) (per curiam) (citation omitted), and remand to the BIA for consideration in the first instance.[9] We note, however, that because "the scope of the statutory term 'particular social group' presents a pure issue of law," our review of any subsequent conclusion by the BIA on this issue is de novo. Elien v. Ashcroft, 364 F.3d 392, 396 (1st Cir. 2004).

The unusually prolonged and convoluted history of this case prompts us to take the further step of retaining jurisdiction over Castañeda's appeal while the BIA addresses these issues on remand. Accordingly, the BIA is requested not to hold Castañeda's case in abeyance while Perú's extradition request is sorted out, but to proceed directly to an adjudication of the indicated issues on remand. Although use of the limited remand device is perhaps not usual in this context, its use is also not unprecedented. See Ucelo-Gómez v. Gonzales, 464 F.3d 163, 172 (2d Cir. 2006) (directing the BIA to issue an opinion responsive to the limited remand within forty-nine days, and retaining jurisdiction in the

---

[9] But see Ucelo-Gómez v. Gonzales, 464 F.3d 163, 170 (2d Cir. 2006) (noting that "if a reviewing court can state with assured confidence (absent agency guidance as to its protectability under the INA) that a group would or would not under any reasonable scenario qualify as a 'particular social group,' it need not remand, and may rule on the issue in the first instance.").

interim); <u>Asani</u> v. <u>INS</u>, 154 F.3d 719 (7th Cir. 1998) (retaining jurisdiction during a limited remand to the BIA to determine whether, <u>inter alia</u>, changed circumstances in the petitioner's home country supported a finding of a well-founded fear of future persecution); <u>Yang</u> v. <u>McElroy</u>, 277 F.3d 158, 164 (2d Cir. 2002). Following the lead of the Seventh Circuit in <u>Asani</u>, in the event that Castañeda is denied relief on remand, "his petition for review in this Court will be reactivated." <u>Id.</u> at 729.

Remand to the BIA is requisite in light of the significant adjudicatory functions that remain to be discharged; in addition, however, we find that the extraordinarily protracted nature of these proceedings justifies retaining jurisdiction pending resolution of those issues. As noted earlier, the subject of this appeal has been the subject of two sets of IJ and BIA decisions, as well as both a panel and an en banc opinion in the First Circuit. As a result, the Castañeda family has been awaiting resolution of their claims for the last eighteen years. The need for a speedy resolution of the petitioner's asylum claims is therefore exceptionally pressing on the facts of this case, and underwrites our retaining jurisdiction over the case while it is on remand to the BIA.

## C.

As noted above, we are here reviewing the BIA's decision and not that of the IJ. However, because the IJ reached the social

-19-

group issue, we pause to underscore our concerns about the IJ's reasoning in this regard. We focus, in particular, on the significance of Matter of Fuentes, 19 I. & N. Dec. 658 (BIA 1988), to the facts of this case.

The term "social group" is not statutorily defined, but has been described as "a group of persons sharing a common, immutable characteristic that makes the group socially visible and sufficiently particular." Larios v. Holder, 608 F.3d 105, 108 (1st Cir. 2010) (internal quotation marks and citation omitted). In other words, the group must be defined in such a way as to set its members apart from the general populace and to ensure that they have visibility as members of the group so defined. Ahmed v. Holder, 611 F.3d 90, 94 (1st Cir. 2010). Neither being a military officer nor being publicly associated (i.e., by the news media) with the massacre requires determination by "subjective value judgments," but rather can be readily determined by objective evidence. Id. at 95. Moreover, as we have noted, membership in a social group "may stem from an innate characteristic or a shared experience." Ang v. Gonzales, 430 F.3d 50, 55 (1st Cir. 2005); see also Matter of Acosta, 19 I. & N. Dec. at 233 (noting that "the shared characteristic . . . might be a shared past experience such as former military leadership").

Relying on Fuentes, the IJ rejected Castañeda's claim of past persecution on the grounds that "Castañeda held an inherently

dangerous position," and the dangers he faced "were 'perils arising from the nature of [his] employment and domestic unrest, rather than 'on account' of immutable characteristics or beliefs." The IJ appears to have read Fuentes to represent a per se rule barring claims of asylum founded on persecution suffered while an active member of the military. But this is far too broad a reading of Fuentes.

The underlying concern in Fuentes was that police officers (and other similarly situated individuals) cannot be eligible for asylum simply because they were exposed to assault in the line of duty. That is, after all, part of their job. In contrast, a former police officer who is persecuted even "where hostilities have ceased," Fuentes, 19 I. & N. Dec. at 662, may be eligible for asylum, because that type of continued, off-the-job persecution directed at the officer personally is decidedly not part of the job. See id. at 661 (noting that "[p]olicemen are by their very nature public servants who embody the authority of the state," and are "often attacked either because they are (or are viewed as) extensions of the government's military forces or simply because they are highly visible embodiments of the power of the state," and that "[i]n such circumstances, the dangers the police face are no more related to their personal characteristics or political beliefs than are the dangers faced by military combatants"); Matter of C-A, 23 I. & N. Dec. at 951 ("[W]e do not

-21-

afford protection based on social group membership to persons exposed to risks normally associated with employment in occupations such as the police or the military. In part, this is because persons accepting such employment are aware of the risks involved and undertake the risks in return for compensation." (citation omitted)). But if there is an exception for former police officers on the grounds that that kind of persecution is not inherent to their job, then it would be inexplicable to not also make an exception for people who, like Castañeda, are persecuted beyond the scope of their employment, even though they happen to be on active duty when such persecution occurs. In other words, the sheer fact of being on active duty is not dispositive under Fuentes, but rather whether the alleged persecution was in response to the petitioner's role as a "highly visible embodiment[] of the power of the state" or was directed against his or her "personal characteristics or political beliefs." Fuentes, 19 I. & N. Dec. at 661. Fuentes does not establish a per se bar to consideration of attacks that occurred while the respondent happened to have been on active duty, where the attacks were not directly related to that fact.

Although we have noted in dicta that "dangers that arise from employment in the military in areas of domestic unrest . . . generally do not support asylum claims," Mediouni v. INS, 314 F.3d at 27 (quotation marks omitted), this statement does not suggest

-22-

that there is a <u>per se</u> rule against asylum claims by former military officers. Not to put too fine a point on it, there is a significant difference between dangers that are directed against the role one occupies -- for instance, as a member of a counter-insurgency squad -- and dangers that attach themselves to an individual personally, even if originating out of actions undertaken and associations forged while occupying such a role.

This understanding of <u>Fuentes</u> squares with the facts of that case itself. The respondent in <u>Fuentes</u> premised his claim of past persecution on attacks that occurred while he was fulfilling his duty as a police officer and United States Embassy guard. <u>See</u> <u>Fuentes</u>, 19 I. & N. Dec. at 659 (describing attacks "while checking the highways" as part of a police patrol and "while he was standing guard" at the U.S. embassy). This stands in sharp relief to the persecution in Castañeda's case which, even though it occurred while he was still an active member of the Peruvian military, was largely motivated by the guerrillas' belief in his responsibility for the Accomarca massacre. These attacks were not, as in <u>Fuentes</u>, tied to whoever happened to be filling the role of police officer or embassy guard or member of the military, but were directed at Castañeda and his family personally. It is surely notable in this regard that the attacks occurred when he was not undertaking official duties, included his family, and included specific

intimations of retribution for Accomarca.[10]  This does not appear to be the kind of danger that a military officer should expect to face simply in virtue of being a military officer, which was what <u>Fuentes</u> cautioned against.

The IJ's overly broad reading of <u>Fuentes</u> ignores the fact that "there may be scenarios where a government official involved in law enforcement should not be precluded from making an asylum or withholding claim." <u>Hernandez-Cabana</u> v. <u>Mukasey</u>, 262 F. App'x 287, 289 (1st Cir. 2008).  Other courts have come to similar conclusions.  <u>See</u> <u>Ahmed</u> v. <u>Ashcroft</u>, 348 F.3d 611, 616 (7th Cir. 2003) (noting that the BIA "may have gone too far" to the extent that it "was suggesting that there is a <u>per se</u> rule against finding past persecution for dangers encountered during service as a police officer"); <u>see also</u> <u>Abaya</u> v. <u>INS</u>, 2 F. App'x 850, 851-52 (9th Cir. 2000) (rejecting government contention that under <u>Fuentes</u>, "violence between guerrillas and military officers 'is inherent to the nature of a revolutionary struggle and cannot be the basis of an asylum claim,'" in part because the attacks on the petitioner did not all occur "during and in the course of his military duties," but "involve[d] threats to and attacks on his family,

---

[10]  In the June 1986 shooting and bomb attack, for instance, the Shining Path left behind leaflets stating "spilled blood will never be forgotten."  Other threats made reference to Castañeda's military code name, "Leopard."  Similarly, when the Shining Path detonated explosives near the home of Castañeda's parents, they left notes saying, "for each dead combatant, ten of yours will die miserable [deaths]."

entry of his name on a hit list, or continuing threats after his military employment ceased," and in part because, contrary to the per se rule articulated in Fuentes, "'[p]olitical revenge and political persecution are not mutually exclusive'" (quoting Lim v. INS, 224 F.3d 929, 934 (9th Cir. 2000)).

The BIA's own findings appear to compel the conclusion that the persecution Castañeda and his family suffered was motivated in large part by his association with the Accomarca massacre. See Sompotan v. Mukasey, 533 F.3d 63, 69 (1st Cir. 2008) (noting that, in the context of pre-REAL ID cases, "a petitioner is not required to show that the impermissible motivation was the sole motivation for the persecution"). Therefore, if "Peruvian military officers whose names became associated with the Accomarca massacre" is a cognizable social group for purposes of asylum and withholding of removal, then it is immaterial whether the persecution he suffered on that basis is additionally labeled "revenge." Finally, in deciding this question, we caution that Fuentes should not be read as expansively as the IJ seems to have suggested.

**D.**

This brings us to the BIA's treatment of Castañeda's claim of a well-founded fear of future persecution, should he be forced to return to Perú. The BIA concluded that Castañeda's fear of future persecution, while subjectively genuine, was not objectively reasonable in light of the years that have since

elapsed and the Shining Path's weakened condition. In reaching its conclusion, the BIA placed the burden on Castañeda to establish that his fear of future persecution was well-founded. The burden was shifted to Castañeda because of the BIA's ruling that he had not shown past persecution on a protected ground. If it becomes clear on remand that the persecution Castañeda undoubtedly suffered was motivated at least in part by his membership in a cognizable social group, then Castañeda will be entitled to a presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13 (b)(1). The burden will then be on the government to rebut this presumption by a preponderance of the evidence. 8 C.F.R. § 1208.13 (b)(1)(i)(A).

## IV.

We vacate the BIA's denial of Castañeda's asylum claim, and remand to provide the BIA with an opportunity to consider whether "Peruvian military officers whose names became associated with Accomarca" is a cognizable social group, bearing in mind that we do not read Fuentes to establish a per se rule against asylum claims raised by those who were military officers at the time of their persecution. Should that question be answered in the affirmative, Castañeda would then be entitled to a presumption of a well-founded fear of future persecution, and absent a sufficient rebuttal by the government, should be deemed eligible for asylum.

As noted earlier, this panel retains jurisdiction over Castañeda's appeal pending resolution of the questions remanded to the BIA.

We stress that this case has been ping-ponging around for over eighteen years, having been the subject of two sets of IJ and BIA decisions, as well as both a previous panel and en banc decision by the First Circuit. A point comes when enough is enough. Regardless of the ultimate outcome of his extradition proceedings, it is our expectation that our opinion today will aid the IJ and BIA in the expeditious and final resolution of Castañeda's asylum claims.

**<u>Vacated and Remanded</u>**.