Not for Publication in West's Federal Reporter

# United States Court of Appeals
## For the First Circuit

No. 13-1179

OLGA MAWA, ET AL.,

Petitioners,

v.

ERIC H. HOLDER, JR., United States Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

Before

Torruella, <u>Circuit Judge</u>,
Souter,[*] <u>Associate Justice</u>,
and Selya, <u>Circuit Judge</u>.

<u>Wei Jia</u> and <u>Law Office of Wei Jia</u> on brief for petitioners.
<u>Gary J. Newkirk</u>, Trial Attorney, Office of Immigration Litigation, Civil Division, Department of Justice, <u>Stuart F. Delery</u>, Assistant Attorney General, Civil Division, and <u>Luis E. Perez</u>, Senior Litigation Counsel, Office of Immigration Litigation, on brief for respondent.

July 7, 2014

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.** Olga Mawa, her husband, Djoko Tri Tunggal, and their three daughters, Cynthia Auyningtyas, Christina Dewi Kartika, and Naomi Manuela Priscilla, all natives and citizens of Indonesia, petition for review of an order of the Board of Immigration Appeals (BIA) summarily affirming an order of an Immigration Judge (IJ) denying their applications for relief from removal. We deny the petition.

I.

Though Indonesia is predominantly Muslim, Petitioners are Christian. Before the IJ, they gave testimony of the following substance. In their native province of Jakarta, they belonged to a church group that lacked a permanent place of worship, and occasionally they would host a religious service. On one such occasion, in February 1998, a group of Muslims interrupted the service by throwing firecrackers at the house, and later that night a brick was thrown through the house's glass door. Petitioners did not report these incidents, out of doubt that the police would take any action.

A few months later, during the so-called "Jakarta riots" of May 1998, rocks were thrown at Petitioners' house while Mawa was inside with her daughters. Elsewhere in their neighborhood, rioters set houses on fire.

Several years after that, in 2005, as Auyningtyas was walking home from school, she was assaulted by a group of young

-2-

Muslim males who groped her and slapped her when she tried to escape. This incident was reported, and Auyningtyas identified the assailants, but the police apparently did nothing, one of them saying only, "Those are naughty children." About a year hence, Kartika was verbally harassed on a public bus by two Muslim men after they noticed the cross on her necklace. They urged her to convert to Islam to avoid future harm. Because she could not identify the men, Petitioners did not file a report.

After these incidents, Petitioners came to the United States, but, with the exception of Kartika, who was enrolled in school here, they returned to Indonesia to care for Mawa's ailing mother. In 2007, during a birthday celebration for Tunggal, two Muslim men entered Petitioners' house and demanded that they stop their prayers. When the family ignored this request, the intruders left to recruit others and returned with five more Muslim men, and an altercation followed in which Mawa was pushed to the ground and received a serious knee injury. She was taken by ambulance to the hospital, where she stayed for two days. Mawa notified the police, who, as far as she is aware, took no action. Later that year, Mawa, Auyningtyas, and Priscilla entered the United States again as visitors and reunited with Kartika. Tunggal joined them in 2008. They are afraid to return to Indonesia.

Petitioners were charged with removability as noncitizens who had overstayed their visas. They conceded removability, but

filed applications for asylum and withholding of removal.[1]  The IJ found that those who testified at the ensuing hearing (Mawa, Auyningtyas, and Kartika) did so credibly.  Nevertheless, the IJ concluded that Petitioners did not satisfy the burden for asylum and, consequently, also failed to shoulder the higher burden for withholding of removal.  In an oral decision, the judge denied the applications for relief.

The BIA affirmed without opinion, and this petition for review followed.

## II.

Where, as here, the BIA affirms without opinion, we review the IJ's decision.  Castillo-Diaz v. Holder, 562 F.3d 23, 26 (1st Cir. 2009).  We examine legal conclusions de novo and factual findings for substantial evidence, accepting them unless the record not merely supports but compels the contrary conclusion.  Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007); see also 8 U.S.C. § 1252(b)(4)(B).

As for the asylum claim, Petitioners must show that they are unable or unwilling to return to Indonesia because they either suffered past persecution, or harbor a well founded fear of future

---

[1] In addition to asylum and withholding of removal, the Government's brief refers to the Convention Against Torture (CAT) as another source of relief sought.  But Petitioners do not appear to have advanced a CAT claim before the IJ or the BIA, and they made no argument to this court about a CAT claim.  Any such claim has by now been waived.  Pangemanan v. Holder, 569 F.3d 1, 3 n.2 (1st Cir. 2009).

persecution, in their case on account of their religion. See 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). Establishing past persecution requires showing, among other things, that the harm suffered resulted from "government action, government-supported action, or government[] unwillingness or inability to control private conduct." Nikijuluw v. Gonzales, 427 F.3d 115, 121 (1st Cir. 2005). Although the IJ determined that Petitioners failed to show this, Petitioners argue that the judge neglected to consider evidence that the Indonesian government is unable or unwilling to control private actors who perpetrate violence against Christians.

There is no question that the record of conflicting material included newspaper articles and Petitioners' own testimony that could be taken to support the claim of governmental indifference or incapacity in the face of anti-Christian violence. Two of the incidents that befell Petitioners, for example, the assault on Auyningtyas and the attack on Mawa in her home, were reported to the police. The response to the former was dismissive, and to the latter Mawa testified they did nothing. But whether "naughty children" reflected sexual permissiveness or religious animus is uncertain; and, as the IJ noted, "whether the police did anything more than accept [Mawa's report of the attack in her home] is not really known." See Barsoum v. Holder, 617 F.3d 73, 80 (1st Cir. 2010) (record did not compel conclusion that police were unable or unwilling to protect petitioner who had "sought

-5-

assistance from the police only once . . . and [had] claim[ed] that they failed to investigate his story, but he never again sought their help").  Other incidents, apparently, were never reported.

Not only is the evidence of a governmental connection weak, but other material in the record belies Petitioners' assertion of it.  For instance, the State Department's August 2009 Issue Paper on Christians in Indonesia gives examples to support its conclusion that, in the preceding years, "[t]he government took steps to bring those responsible for religiously motivated violence to justice."  So too, the State Department's November 2010 International Religious Freedom Report on Indonesia recites evidence that the government investigates and prosecutes religiously motivated crime.  In sum, the record does not compel the conclusion that the Indonesian government is unable or unwilling to control private actors who perpetrate religious violence.  Accordingly, the IJ's determination that Petitioners failed to establish past persecution must stand.[2]

To establish a well founded fear of future persecution, Petitioners must demonstrate a fear that is both subjectively genuine and objectively reasonable.  Castaneda-Castillo v. Holder,

_____

[2] In addition to a governmental connection, past persecution requires that the harm suffered exceed "unpleasantness, harassment, and even basic suffering."  Nelson v. I.N.S., 232 F.3d 258, 263 (1st Cir. 2000).  The IJ determined that Petitioners failed to make this showing as well.  Because, in our view, the IJ did not err in concluding that Petitioners failed to establish the governmental connection, we need not consider this additional determination.

638 F.3d 354, 362 (1st Cir. 2011). In the absence of probative support that a showing of past persecution was made, the IJ concluded that Petitioners' fear, while subjectively genuine, was not objectively reasonable. The judge explained that violence against Christians in Indonesia has declined significantly and that, even if returning to Jakarta would be dangerous, Petitioners could live safely in other parts of the country. Petitioners argue that the IJ selectively cited parts of the record and ignored others. We, however, find the IJ's conclusion to be supported by substantial evidence.

Here again, the record contains some conflicting material, and Petitioners are correct that even the documents cited by the IJ fall short of painting an entirely one-sided picture. But it is another thing to say that the IJ failed to take account of the contrary evidence. Thus, in discussing the 2010 International Religious Freedom Report, the IJ explicitly noted that, during the reporting period, "there were 200 incidents of religious freedom violations in the country." The IJ simply weighed this fact against others, such as the Report's documentation of "numerous areas of improvements in religious freedom." And while Mawa testified that her Christian relatives in Indonesia continue to experience difficulties on account of their religion, the most recent incident to which she testified was the burning of a sibling's house during the Jakarta riots of May 1998.

It is not, therefore, fair to claim that the IJ ignored Mawa's testimony in concluding that Petitioners' relatives "have not experienced any religious-based violence since [Petitioners] have been here in the United States."

Petitioners take particular issue with the fact that the IJ's decision refers to the Indonesian constitution's promise of religious freedom. As they say, this guarantee has been on the books since 1945, but has been scant protection during periods of rampant religious violence, such as the May 1998 riots. But the IJ did not merely refer to the constitution, for her exposition spoke to the 2010 International Religious Freedom Report, which not only explains that "[t]he constitution provides for freedom of religion," but also proceeds to say that, during the reporting period, "[t]he government generally respected religious freedom for the six officially recognized religions," including Christianity. We have previously endorsed such citations, see, e.g., Kamuh v. Mukasey, 280 F. App'x 7, 10 (1st Cir. 2008); Nikijuluw, 427 F.3d at 119, and even if the IJ's passing reference to the constitution were misplaced, the judge's conclusion would hardly stand or fall on it.

Finally, contrary to Petitioners' argument, substantial evidence supports the IJ's determination that they could safely live in other places within Indonesia, if not in Jakarta. The Issue Paper, for example, not only notes an overall downward trend

in religious violence, but indicates that the five Indonesian provinces housing Christian majorities, of which Jakarta is not one, are particularly safe for Christians. See Susanto v. Gonzales, 439 F.3d 57, 61 (1st Cir. 2006) ("[T]he IJ reasonably concluded that, were petitioners threatened with . . . harm, they reasonably might relocate to a safer part of Indonesia, such as the areas with a Christian majority."). Hence, the record does not compel the conclusion that Petitioners established a well founded fear of future persecution. Absent a showing of either past persecution or a well founded fear of persecution in the future, the asylum application was properly denied.

To be eligible for withholding of removal, Petitioners must show that on removal to Indonesia they would more likely than not face future persecution on account of their religion. See 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)(2). Because the "more likely than not" standard for withholding of removal is stricter than that for asylum, Petitioners' inability to satisfy the asylum standard precludes their meeting the standard for withholding of removal, see Mediouni v. I.N.S., 314 F.3d 24, 27 (1st Cir. 2002), which was properly denied.

III.

The petition for review is DENIED.